**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| KOJI IP, LLC,<br><br>                              Plaintiff,<br>        v.<br><br>RENESAS ELECTRONICS AMERICA,<br>INC.,<br><br>                              Defendant. | Case No.: 3:24-cv-03089-PHK<br><br><br>**DECLARATION OF WILLIAM P. RAMEY, III** |

I, William Ramey, declare as follows:

1.   My name is William P. Ramey, III.  I am over the age of 21. I have personal knowledge of the facts contained herein, which are true and correct. If called as a witness, I could competently testify to these statements.

2.   I am licensed to practice law in the state of Texas and am an attorney with the law firm of Ramey LLP and I am admitted pro hac vice in this case. I represent the Plaintiff in the above-captioned lawsuit.

3.   Exhibit A is a true and correct copy of the hearing transcript from the September 24, 2024 hearing on the Magistrate Court's Order to Show Cause.

4.   Exhibit B is a chart listing the 56 cases as identified by the Magistrate Court in its Order Regrading OSC and Imposing Sanctions on Ramey Firm Lawyers at pages 4 through 8.[1]  Each of case 1-7, 9-21, 43, 50, and 53-56 were transferred to California.  Each of cases 8, 22-42, 44-49, 51 and 52 were filed in California for reasons of venue.  None of the clients in any of the 56 cases were organized in California or domiciled in California.

---

[1] Doc. No. 42 at 4-8.

5.  Case 6 from Exhibit B was transferred to California from New York.  A Case Management Conference document was jointly filed by Plaintiff and Defendant and then the court dismissed the complaint based on a motion to dismiss filed while the case was in New York.

6.  Case 7 from Exhibit B was transferred from Texas to California.  My firm never appeared in the case and did not even respond to a motion to stay filed by Google.

7.  Case 50 from exhibit B was transferred from Texas to California.  However, the case was settled by a third party at the time of the transfer.  Defendant filed two stipulations that included my signature, a stipulation to extend the time for the defendant to answer and a stipulation to dismiss the case.

8.  Exhibit C is a true and correct copy of a printout on April 5, 2025, indicating my eligibility to practice law in the State of Texas.

9.  Exhibit D is a true and correct copy of a printout on April 5, 2025, indicating Mr. Kubiak's eligibility to practice law in the State of Texas.

10. Exhibit E is a true and correct copy of an e-mail message I received from Gene Quinn on April 4, 2025 wherein he is censoring me at least in part for the Magistrate's Order.

11. Exhibit F is a true and correct copy of the claim chart filed as Doc. No. 1-2 in case No. 5:24-cv-03089.

12. Exhibit G is a true and correct copy of the claim chart filed as Doc. No. 11-2 in Case No. 3:23-cv005752.

13. After counsel for Renesas indicated sales were low for the accused product, we identified other possible infringing products, including PTX130W/PTX30W, and shared them with Renesas' counsel indicating that we might include charts at the time for infringement contentions.  However, the product PTX130W/PTX30W was not in the complaint or otherwise accused in any infringement contentions or lawsuit.

14. Exhibit H is a true and correct copy of the Amended Complaint, without exhibits, filed on January 12, 2024, in Case No. 3:23-cv-05752.

15. Exhibit I is a true and correct copy of an e-mail received from counsel for Renesas on January 18, 2024.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 7, 2025.



William P. Ramey, III

# EXHIBIT A

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Peter H. Kang, Magistrate Judge

4

5   KOJI IP, LLC,                    )
                                     )
6            Plaintiff,              )
                                     )
7   vs.                              )   No. C 24-03089-PHK
                                     )
8   RENESAS ELECTRONICS AMERICA,     )
    INC.,                            )
9                                    )
             Defendant.              )
10  _____ )

11                                   San Francisco, California
                                     Thursday, September 19, 2024
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 10:31 - 11:50 = 1 HOUR 19 MINUTES
14

15  APPEARANCES:

16  For Plaintiff:
                                 Ramey, LLP
17                               5020 Montrose Boulevard
                                 Suite 800
18                               Houston, Texas 77006
                             BY: SUSAN S.Q. KALRA, ESQ.
19                               WILLIAM P. RAMEY III, ESQ.
                                 JEFFREY KUBIAK, ESQ.
20  For Defendant:
                                 Maschoff Brennan
21                               450 Sansome Street
                                 Suite 1005
22                               San Francisco, California
                                 94111
23                           BY: JASON A. CROTTY, ESQ.

24

25

*Echo Reporting, Inc.*

2

1  Transcribed by:              Echo Reporting, Inc.
                               Contracted Court Reporter/
2                              Transcriber
                               echoreporting@yahoo.com
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1 <u>Thursday, September 19, 2024</u>                    <u>10:31 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK:  Now calling Civil Matter 24-3089, Koji

5 IP versus Renesas Electronics America.

6      Counsel, when speaking, please approach the podiums and

7 state appearances for the record.

8          THE COURT:  Why don't we have counsel approach.

9 Since we're -- don't have a court reporter, we're recording

10 this for transcription purposes, you need to speak into the

11 microphones at the -- at the podiums, please.  And, guys,

12 just remember, kind of like in a deposition, everyone speak

13 one at a time, again, just for audio transcript purposes.

14      Can I get appearances.

15          MS. KALRA:  Good morning, your Honor.  Susan

16 Kalra, appearing for the Plaintiff.

17          THE COURT:  Yes.

18          MR. CROTTY:  Jason Crotty of Maschoff Brennan,

19 appearing for Defendant Renesas Electronics of America.

20          THE COURT:  Mr. Crotty, since this is an order to

21 show cause hearing, I -- I mean, unless things spill over,

22 I'm probably not going to allow you to have much to say

23 because it's not really your motion anymore.  That's already

24 submitted.

25          MR. CROTTY:  Understood.  Thank you.

4

```
 1           THE COURT:  Ms. Kalra, who's here with you today?
 2           MS. KALRA:  Mr. William Ramey.
 3           MR. RAMEY:  Good morning, your Honor.
 4           THE COURT:  Good morning.
 5           MS. KALRA:  And Mr. Jeffrey Kubiak.
 6           MR. KUBIAK:  Good morning, your Honor.
 7           THE COURT:  Good morning.
 8       All right.  Ms. Kalra, are you going to be speaking on
 9   behalf of all three of the Ramey attorney lawyers, Ramey
10   Firm lawyers, or who's going to do most of the talking?  You
11   all three could talk of course.
12           MS. KALRA:  I will not.  Mr. Ramey will handle
13   most of it.
14           THE COURT:  Okay.  Let's take care -- since -- Mr.
15   Ramey, since you actually aren't counsel of record in the
16   case but I see you're going to be making representations of
17   fact to the Court, I'm going to ask that the court reporter
18   -- sorry -- the Deputy to swear both you and Mr. Kubiak just
19   so we cover all our bases there.  So, if you both could
20   please stand.
21           THE CLERK:  Raise your right hand.  Do you
22   solemnly swear or affirm that the testimony you're about to
23   give before this Court shall be the truth, the whole truth,
24   and nothing but the truth, so help you God or so you affirm?
25           MR. RAMEY:  I do.
```

5

```
 1           MR. KUBIAK:  I do.
 2           THE CLERK:  Thank you.  You may be seated.
 3           THE COURT:  And since Mr. Crotty is probably not
 4  going to jumping up to speak, Mr. Kubiak, if you want to,
 5  you could use the other microphone on the other podium if
 6  you want to speak.
 7           MR. KUBIAK:  Thank you, your Honor.
 8           THE COURT:  Okay.  All right.  So, Mr. Ramey, I
 9  guess you're going to be doing most of the talking?
10           MR. RAMEY:  Yes, your Honor.
11           THE COURT:  All right.
12           MR. RAMEY:  Yes, your Honor.  So, we received your
13  show cause order.  Ms. Kalra reported to me after the August
14  22nd hearing that she had with you that you brought up some
15  issues about our use of pro hac vice anticipated on the
16  signature lines on pleadings.
17      Immediately upon receiving that feedback from Ms.
18  Kalra, we discontinued that practice.  It was never our
19  intention, your Honor, to indicate that either myself or Mr.
20  Kubiak was a licensed California attorney.  As I said in the
21  briefing to the Court, we did that main -- for -- for two
22  reasons.  We did that first because one of our clients asked
23  us as cases were resolving more quickly, to discount some of
24  that expense up front, and we recognized that was a mistake
25  when to Court pointed it out.  We have discontinued that.
```

6

1    And, secondly, as we put in the briefing, there was

2 some personal issues going on with Ms. Kalra, and we left

3 that on there for notice purposes.

4    I, as the managing partner of the firm, am aware of the

5 issues, but I did not read her sealed declaration because

6 that was between the Court and Ms. Kalra, not me.  So, I

7 can't comment on that part of it.

8         THE COURT:  Okay.  All right.  So, first of all,

9 just to confirm, Mr. Ramey and Mr. Kubiak, I just want to

10 make 100 percent sure you're -- neither of you are members

11 of the California Bar?

12         MR. RAMEY:  I am not, your Honor, Mr. Ramey.

13         MR. KUBIAK:  I am not, your Honor.

14         THE COURT:  Okay.  And none of you, therefore, are

15 members of the Bar of this Court?

16         MR. KUBIAK:  That is correct.

17         MR. RAMEY:  Correct, your Honor.

18         THE COURT:  Okay.  And, as you point out, I mean,

19 I think you say in the OSC response and I think in some of

20 the declarations that the way you've handled pro hac vice in

21 this court was a mistake essentially and that you've tried

22 to rectify that, right?  Summarizing too generally or is

23 that basically it?

24         MR. RAMEY:  No, your Honor.  I think that's

25 correct.  We -- we weren't trying to misrepresent anything,

7

1  but once the Court pointed that out, we've changed

2  practices.

3          THE COURT:  Okay.  So, just so, again, I'm clear,

4  you don't -- I mean, the OSC order itself refers to the

5  Civil Local Rules on pro hac vice admission, and, this,

6  again, is for unauthorized practice of law.  Given the

7  response, you don't really engage with those legal -- the

8  legal standards of those rules.  As I read -- read the

9  response and the declarations, the response is that you're

10 changing your internal procedures to avoid those issues

11 going forward.  Is that correct?

12         MR. RAMEY:  Correct, your Honor.  We don't want to

13 give the impression that we're trying to indicate we're

14 licensed in California.

15         THE COURT:  Okay.  So, is there really -- I mean,

16 you agree there's been a failure to comply with the Local

17 Rules on pro hac vice admission?

18         MR. RAMEY:  Your Honor, we -- we always thought we

19 were practicing under the -- the license of Ms. Kalra.  So,

20 we never thought that we were in violation.  We never

21 intended that to be the case.  We modified the practice when

22 the Court pointed it out.  So, if what was done in the past

23 is deemed to have been a violation, then, yes, your Honor,

24 we were in violation.  But we -- we never intended that to

25 be -- we always had pro hac vice anticipated in cases that

8

1    did carry on longer.

2              THE COURT:  Right.

3              MR. RAMEY:  We did, in fact, do the pro hac vice

4    and have people admitted.  So, that was our mistake for not

5    doing it right at the start, your Honor.

6              THE COURT:  Right.  Okay.  So, and I think in the

7    order to show cause you've got a long list of cases where

8    you, Mr. Ramey, have either appeared as counsel or your

9    name's on the pleadings going back to 2017.  And I think for

10   Mr. Kubiak, it goes back at least a couple -- one or two

11   years.  And, of course, the list is longer for Mr. Ramey.

12       I mean, you've been aware of the Court's Local Rules

13   since 2017, right?

14             MR. RAMEY:  Yeah.  I was -- yes, your Honor, we

15   were aware of the Local Rules.  We -- we -- we just didn't

16   understand that was a violation, what we were doing.

17             THE COURT:  Okay.  Well, Local Rule 11-3 says --

18   and I think we say this in the OSC -- that you're supposed

19   to file your PH -- pro hac vice applications at the time of

20   the filing of the complaint, right?

21             MR. RAMEY:  Yes, your Honor.

22             THE COURT:  Okay.  And since we've put in the

23   order to show cause order it's at least 48 cases where you

24   never filed a pro hac vice application and certainly not at

25   the time of the filing of the complaints in those cases,

9

1  including the -- the cases here in front of me, right?

2          MR. RAMEY:  Yes, your Honor.  I think that -- yes,

3  your Honor.

4          THE COURT:  Okay.  And for Mr. Kubiak, I think we

5  talked about this, 16 plus the -- this case and what I'm

6  calling the second case.  So, that's a total of 18 cases, is

7  that right?

8          MR. KUBIAK:  Yes, sir.  I think that's correct.

9          THE COURT:  Okay.  And, so, again, I just want to

10 be clear.  You're not -- technically, those are violations

11 of the Local Rules, right?

12         MR. RAMEY:  Yes, your Honor.  We -- we

13 misapprehended the way we were practicing.  We -- we

14 modified that practice.

15         THE COURT:  All right.  And, again, the Local

16 Rules require filing the application at the time of the

17 complaint and also filing -- submitting the fee for the pro

18 hac vice application at the time of the complaint, right?

19         MS. KALRA:  If I may, your Honor.  11-3 also says

20 it can be filed at the time of the complaint or at the time

21 of first appearance, the pro hac vice application.

22         THE COURT:  Okay.  So, if Mr. Ramey and Mr. Kubiak

23 were not appearing in the case yet but they -- but they

24 anticipated that they might, then -- and it doesn't -- the

25 Rule doesn't say at the earlier.  It just says that that's

10

1   when you have to file is at the time you're filing at the

2   complaint or at your first appearance.

3           THE COURT:  So, it's your -- well, their names

4   appear on the pleadings, on the complaints.  Isn't that an

5   appearance?

6           MS. KALRA:  As pro hac vice anticipated?

7           THE COURT:  Well, it's an appearance to the Court.

8   Once their names are on the pleadings, they've appeared,

9   haven't they?

10          MS. KALRA:  They haven't been admitted yet, and --

11          THE COURT:  Well, that's the whole point.

12          MS. KALRA:  Right.  So --

13          THE COURT:  They put their names on a pleading,

14  like a complaint.  They've appeared in front of the Court,

15  and the Rule says you're supposed to file your pro hac vice

16  application at that time.

17      (Pause.)

18          THE COURT:  Right?

19          MR. RAMEY:  Your Honor, we were misapplying the

20  rule until we -- until we appeared in person because we

21  always originally said we were always using Ms. Kalra to do

22  the appearances until we got further in the case.

23          THE COURT:  Okay.  I'll get to that in a second,

24  but I just want to close the loop on this.  You're not

25  interpreting first appearance as first appearance like

11

1   standing up in court, are you?

2          MS. KALRA:  Not necessarily.  I mean, there's --

3   there's a number of ways that --

4          THE COURT:  Right.  You appear in front of the

5   Court when you file a pleading with your name on it as

6   counsel for a party.

7          MS. KALRA:  That's a fair interpretation.

8          THE COURT:  Okay.  So, again, just so I'm clear,

9   not really a -- I just want to make sure there's not really

10  a dispute here that in the 40 plus cases for Mr. Ramey and

11  the 16 or 18 cases for Mr. Kubiak, there was a violation of

12  the Local Rule in terms of the timing of the filing of the

13  pro hac vice applications, right?

14         MR. RAMEY:  Yes, your Honor.

15         THE COURT:  Okay.  And it was also a violation of

16  the Local Rule in all those cases, including the one here,

17  by not paying the fee at the time those applications would

18  have been due, right, or fees?

19         MR. RAMEY:  Because no application was filed, no

20  fee was paid, correct, your Honor.

21         THE COURT:  And, Mr. Kubiak (sic), with regard to

22  this case, did you advise either Mr. Ramey or Mr. Kubiak

23  about what the Local Rules require and the timing issues?

24         MS. KALRA:  On this specific case?

25         THE COURT:  Yes.

12

1        MS. KALRA:  I advised them of your Honor's
2   position after the last hearing.  However --
3        THE COURT:  Yeah.  I'm -- I'm talking about at the
4   time the case started here.
5        MS. KALRA:  Correct.  I've worked with Mr. Ramey
6   and Mr. Kubiak on many many many cases, and the rule has
7   been the same as far as I know for many many years now, and
8   I know I've had a discussion several times with everybody at
9   the firm about that, but I don't recall having that
10  discussion in this particular case.
11       THE COURT:  Okay.  All right.  All right.  I
12  should have said this up -- because I'm going to -- I think
13  we're going to use these terms just for the record.  When
14  they're called something like -- there are three cases
15  involving Koji and Renesas.  The first case is the Colorado
16  case, which is Docket Number 21-1674.  What I might refer to
17  and the parties might refer to as the second case is the
18  case -- second case filed here in the Northern District of
19  California, Docket 23-5752.  And the third case is the
20  current case here that raised all these issues, which is
21  Docket Number 24-3089.  So, you all understand that's what I
22  mean.  The first case is the Colorado case.  Second case was
23  the second in line but the first Northern District case, and
24  then the third case is this current case.
25       MR. RAMEY:  Yes, your Honor.

13

1          THE COURT:  So, we have the same terminology in
2  mind.  Okay.
3     Okay.  I mean, I understand that that was your
4  practice, and I appreciate you being candid about
5  misapplying the Rule.  Was there any attempt at the Ramey
6  Firm to do legal research on -- to -- to justify the
7  practice that you had had in the past about not filing pro
8  hac vice applications or was it just a procedural managerial
9  decision, as you said?
10         MR. RAMEY:  Your Honor, if you go back to the --
11  towards the earlier cases, we always filed pro hac vice.  It
12  was -- it was in consultation -- discussions with the client
13  that we -- we slipped into doing it the other way because
14  some of the -- he was having a lot of cases resolve real
15  quickly at the low end expense.  So, that's -- we
16  acknowledge that we let that Rule slip, and we acknowledge
17  that, your Honor.
18         THE COURT:  Okay.  So, and you say that this was
19  -- this practice of not filing the pro hac vices was done at
20  the request of -- I'm going to mispronounce his name again
21  -- Mr. Go -- help me out.
22         MR. RAMEY:  I pronounce -- mispronounce it every
23  time too, your Honor.  It's Doctor Gorrichategui's.
24         THE COURT:  Gorrichategui.  Okay.  So, Mr.
25  Gorrichategui, I think you said that it was a request he

14

1   made near early '22, but the list of cases and the order to

2   show cause found go back to certainly before '22 a number of

3   them.  The earliest one is 2017, where on pro hac vices were

4   filed.  And, like I said, there's a number of them leading

5   up to 2022.

6        I guess, first, generally, a lot of the cases -- most

7   of the cases don't involve Koji as a Plaintiff.  So, does

8   Mr. Gorrichategui, is he the -- the client in charge of all

9   the cases we've listed here in the order to show cause?

10           MR. RAMEY:  No, your Honor.  The -- some of the

11  ones for 2017 were actually transferred from Texas into

12  California.  So, we were on the pleadings already.  We never

13  made an appearance in that matter because we weren't trying

14  to make an appearance in those -- in that case once it was

15  transferred.  I believe we're talking about the Traxcell v.

16  Apple cases.

17           THE COURT:  No.  The earliest 2017 case is Global

18  Equity v.  Alibaba Group.

19           MR. RAMEY:  And that was another -- another --

20  another instance of a case transferred that was in

21  California.  That -- that was Hicks -- John Thomas with

22  Hicks Thomas was the -- the lead on it.  So, that was a --

23  that one I didn't look at in particular separate from what I

24  did in the pleading, but that was so long ago.  That one was

25  a mistake of not having it on there then.  That's -- that

15

1  one I -- just a mistake.  It was the incorrect practice.

2         THE COURT:  All right.  So, I guess the -- the

3  question is, you know, obviously Koji is a client of yours

4  and Mr. Gor --

5         MR. RAMEY:  Doctor Gorrichategui, your Honor.

6         THE COURT:   -- Gorrichategui is in charge of Koji

7  because it owns or controls -- is owned or controlled by

8  DynaIP, I take it?

9         MR. RAMEY:  Your Honor, Koji IP, LLC is -- is the

10 -- owns the IP, and then it's managed by DynaIP Deals, which

11 is managed by Doctor Gorrichategui.

12        THE COURT:  Got it.  Okay.  So, are the -- I mean,

13 even the ones that -- that are post-2022 of the cases listed

14 on page five of the order to show cause, was that request

15 from Doctor Gorrichategui, did that apply to all these

16 cases?  I mean, he wasn't the client for all these cases,

17 was he?

18        MR. RAMEY:  He is the managing member for -- for

19 all those cases.

20        THE COURT:  He is the managing member?

21        MR. RAMEY:  For different LLC entities.

22        THE COURT:  Right, right.

23        MR. RAMEY:  Okay.  Pardon me.

24        THE COURT:  Through the DynaIP management of those

25 entities?

16

1           MR. RAMEY:  Yes, your Honor.

2           THE COURT:  Okay.  So, for example, VDPP, that's a

3  DynaIP --

4           MR. RAMEY:  Yes.

5           THE COURT:  -- entity?

6           MR. RAMEY:  Yes, your Honor.

7           THE COURT:  All right.  And then let's go back to

8  the earliest from 2022.  Here we go.  Valjakka v. Netflix?

9  That's a 2022 -- that's a March 2022 case.

10          MS. KALRA:  I believe Mr. Ramey's admitted in that

11 case.

12          MR. RAMEY:  Yes, your Honor.  I'm admitted in that

13 one.

14          THE COURT:  Okay.  What about Traxcell Techs v.

15 Google?

16          MR. RAMEY:  That was the -- Traxcell v. Google was

17 transferred from Texas to California.  I never entered an

18 appearance.  The case was dismissed shortly thereafter by

19 Judge Corley.

20          THE COURT:  Okay.  E-submissions Software?

21          MR. RAMEY:  Doctor Gorrichategui, your Honor.

22          THE COURT:  Okay.  Escape XIP?

23          MR. RAMEY:  Doctor Gorrichategui, your Honor.

24          THE COURT:  So, everything from '22 -- '22 onward,

25 all these entities are Doctor Gorrichategui's?

17

1        MR. RAMEY:  He's the manager of the -- the LLC's,

2   your Honor.

3        THE COURT:  Okay.  But what about pre 2022?  I

4   mean, if he made the request in 2022, that doesn't explain

5   why there were no pro hac vices filed in a number of cases

6   before 2022.

7        MR. RAMEY:  No, your Honor.  That doesn't -- the

8   ones that were -- I know the Valjakka v. Netflix, I was

9   admitted in that one.  That case I've now withdrawn as

10  counsel from -- your Honor, I'm sorry.  Now I'm not thinking

11  of the Court's name.  I apologize, your Honor.

12       THE COURT:  That's okay.

13       MS. KALRA:  Judge Tigar.

14       MR. RAMEY:  Judge Tigar, yes, your Honor.

15       THE COURT:  Okay.  Tigar it's pronounced.

16  CyboEnergy v. Movin Electric Power Tech?

17       MR. RAMEY:  Yes, your Honor.  That one -- that's a

18  Doctor Gorrichategui case.

19       THE COURT:  Riggs Tech Holdings v. Vagaro?

20       MR. RAMEY:  Yes, your Honor.

21       THE COURT:  Okay.  But if you made the request in

22  2022, these are 2021 cases.  So, I'm just -- again, I

23  understand that he made the request that you not file pro

24  hac vice's in 2022 according to the declarations, but if

25  these were DynaIP cases before 2022, what explains the

18

1  failures in those cases?

2        MR. RAMEY:  There was error in the process that we

3  had at the firm, your Honor.

4        THE COURT:  Okay.  PacSec3 v. Juniper Networks?

5        MR. RAMEY:  That was, again, a case that was

6  transferred from the Western District when it was settled.

7  It was settled as it was being transferred.  So, we didn't

8  -- we were intending to make an appearance in that case.

9        THE COURT:  Okay.  Apple v. Traxcell Techs?

10        MR. RAMEY:  Same -- same situation, your Honor.

11  It was transferred from Texas.  We were intending to enter

12  an appearance as we were in settlement.

13        THE COURT:  I may be mispronouncing it, DATRAC or

14  DATRAC v. PrognoCIS?

15        MR. RAMEY:  Prognosis?  Your Honor, that was

16  another case that we were in settlement talks at the time.

17        THE COURT:  NetSoc v. LinkedIn?

18        MR. RAMEY:  That was another -- pardon me, your

19  Honor.  NetSoc v. LinkedIn, that was error on the part of

20  the firm.  That case was filed.

21        THE COURT:  Okay.  NetSoc v. Quora?

22        MR. RAMEY:  Same thing, your Honor.  The -- the

23  NetSocs cases.  They are not Doctor Gorrichategui cases.

24        THE COURT:  So, those were -- those were errors.

25  Global Equity Management v. Alibaba?

19

1          MR. RAMEY:  That case was -- was filed in -- in

2    the Eastern District of Texas, and it was caught up and

3    stayed when it was transferred out to California.  So, we

4    never entered an appearance.  The PTAB disposed of that

5    patent, and the case was dismissed.

6          THE COURT:  Okay.  And there's another Global

7    Equity Management v. eBay case?

8          MR. RAMEY:  That -- that's the same JIMSA

9    (phonetic).

10          THE COURT:  Okay.  And I think we already talked

11    about Global Equity Management v. Alibaba?

12          MR. RAMEY:  Yes, your Honor.  Same -- same facts

13    on that one.

14          THE COURT:  And I'm 99 percent sure that the cases

15    we listed in the order to show cause for Mr. Kubiak overlap

16    with the cases for Mr. Ramey, is that right?  Are there any

17    others that you're aware of where Mr. Kubiak's on the

18    pleadings but -- or appeared but Mr. Ramey didn't?

19          MR. KUBIAK:  No, your Honor.  As far as I know,

20    there's not.

21          THE COURT:  Okay.  And I know Mr. Ramey's doing

22    most of the talking, but I want -- again, anything you want

23    to add on your own behalf with regard to failures to file

24    pro hac vices in those cases?

25          MR. KUBIAK:  I'm not as familiar with the cases as

20

1  Mr. Ramey is.  He knows them by -- by name and docket.  As
2  the -- the 18 cases that were listed for me, four of those
3  were -- were transferred from Western District.  Nine of
4  them I was listed on the jury charge as an attorney, and it
5  was -- that was in error as well.  Four of them is my
6  recollection I'm actually listed on the complaint.  And,
7  so --
8           THE COURT:  Yes, but was it just error?
9           MR. KUBIAK:  Well, it's -- it's an error as in not
10  understanding the Rule I suppose.
11           THE COURT:  Okay.  All right.  And we -- I don't
12  know if we gave the full list, but I think the order to show
13  cause indicates that Mr. Ramey has appeared and/or currently
14  working on at least 37 cases in the Central District of
15  California.  Is that -- any dispute about that number?  Is
16  it?
17           MR. RAMEY:  No, your Honor.  That's -- I think
18  most of those are now closed, but there may be a couple of
19  them that we're handling.  But when we're filing new
20  documents for each other, we removed that from the
21  pleadings.
22           THE COURT:  Okay.  And then, Mr. Kubiak, we
23  counted about 10 cases in the Central District.  Is that
24  right?  I'm assuming that you've got the numbers, right?
25           MR. KUBIAK:  I would have to defer to Mr. Ramey on

21

1 that.

2          THE COURT:  Okay.  And, again, I think we -- what

3 we saw was, similarly, there was a failure to file pro hac

4 vice applications in the Central District in most -- most of

5 those cases.  Again, tell me if I'm wrong in our review of

6 the records there.

7          MR. RAMEY:  So, the -- a few of the -- one of the

8 cases was transferred out from Texas.  And, so, it was

9 closed shortly thereafter.  But, your Honor, generally, that

10 is closed.

11          THE COURT:  Okay.  What I saw from at least one

12 document is actually the clerk's office in that court sent

13 you -- sends notices out when pro hac vices are overdue.

14 So, I think you received at least a number of those, right?

15          MR. RAMEY:  Yes, your Honor.

16          THE COURT:  Okay.  You know, I -- I've got a

17 factual question.  I know Ms. Kalra works out of your

18 Redwood City office, is that right?  She said that at the

19 last hearing.

20          MR. RAMEY:  Yes, your Honor.

21          THE COURT:  All right.  But I saw, and I think

22 it's required under the Local Rules in the Central District,

23 your website says you've got a Los Angeles office.  Is that

24 -- is that wrong?  Is that right?

25          MR. RAMEY:  We have a Los Angeles address, yes,

22

1   your Honor.

2           THE COURT:  Okay.  All right.  Who works there?

3           MR. RAMEY:  Ms. Kalra.

4           THE COURT:  Okay.  How much?  What percentage of

5   your time, Ms. Kalra, do you spend down there?

6           MS. KALRA:  As I mentioned during the last

7   appearance and as still continues now, since mid 2023 --

8           THE COURT:  Yeah.

9           MS. KALRA:  -- my living situation has changed

10  drastically.

11          THE COURT:  So, let's -- let's talk about the --

12          MS. KALRA:  Okay.

13          THE COURT:  -- historical period before your

14  personal situation distracted you from being able to work.

15          MS. KALRA:  So, I pretty much split my time

16  between Northern California and Southern California.

17          THE COURT:  Okay.

18          MS. KALRA:  Until fairly recently.

19          THE COURT:  Okay.  So, about 50/50 here and --

20          MS. KALRA:  Yes.

21          THE COURT:  -- and in the Central District?  Okay.

22  Okay.  And then in the -- I think you -- and maybe this is

23  reference to -- I think it's in reference to Ms. Kalra's

24  personal situation, which I won't go into in open court.  In

25  the OSC response, you talk about you added your names to the

23

1  pleadings in this case and I think in other cases to provide

2  notice?  I think you mentioned the word -- You talked about

3  providing notice, and I guess I just was -- notice for what

4  purpose and to whom?

5          MR. RAMEY:  Yes, your Honor.  Maybe that was an

6  inarticulate way to do it.  Notice so that we get notice

7  back when filings are received.  We were just making sure

8  that nothing was missed.

9          THE COURT:  So, that you would receive notice of

10 filings, not that people would get notice from you, right?

11         MR. RAMEY:  That's correct.

12         THE COURT:  I see.  Okay.  And are you both --

13 you, Mr. Kubiak, Mr. Ramey, are you ECF filers?  Do you have

14 ECF accounts with the court?  Is that how you get notice?

15         MR. KUBIAK:  Yes, your Honor, I do.

16         MR. RAMEY:  No -- well, I don't know if I have

17 one.  My paralegal takes care of that, your Honor.  I

18 apologize.  I do know in the last 18 months we have switched

19 practices.  So, now we use a third party service that gives

20 us notices so we can put a tag line on everything that gets

21 filed as we -- as we get the filing papers.  It's through

22 Ms. Kalra's login.  So, I don't think it comes in to me

23 specifically, but it comes in through Ms. Kalra's ECF.

24         THE COURT:  Okay.  All right.  But when you said

25 in the OSC response that you -- it's for notices so that you

24

1  get notice of filings from the Court?

2          MR. KUBIAK:  Yes, sir.

3          THE COURT:  Is that -- I just want to make sure I

4  understand that.

5          MR. KUBIAK:  Absolutely.

6          MR. RAMEY:  Yes, your Honor.

7          THE COURT:  All right.  And then in the OSC

8  response, you -- you say -- you said there was no deceptive

9  intent or intent to indicate that you were licensed here in

10 California, which I take -- you said that here today.  I

11 guess that raises a question in my mind because you don't

12 really discuss the legal standards for -- under the Local

13 Rules for unauthorized practice of law.

14     Is -- is your mens rea even relevant?  Am I supposed to

15 take that into account here?

16         MR. RAMEY:  Your Honor, I think the -- to the

17 extent we were advising any of these clients on the scope of

18 a patent claim, whether the accused product fit within the

19 scope of those claims, our USPTO license does, in fact,

20 allow us to -- to give nationally general -- general -- but

21 we can't appear in a courtroom and hold ourselves out as

22 California attorneys, but we are allowed to give advice to

23 clients as to the validity of their patent, whether their

24 patent might be infringed, whether someone else's product

25 falls within the scope of those claims.

25

1        THE COURT:  Well, I mean, I'm -- I think I still
2   am.  I was a registered patent attorney.  I mean, we all
3   know work in the Patent Office doesn't involve opinions on
4   infringement, right?  I mean, Patent Office work is not --
5   Patent Office doesn't decide infringement issues.
6        MR. RAMEY:  That's correct, your Honor.  We cited
7   a case in the OSC response from the Ninth Circuit that --
8   that provides that we're able to give those opinions, but
9   we're not able to hold ourselves out as California lawyers.
10        THE COURT:  I'll take a closer look at that.  But
11   that didn't really answer my question.  I mean, you make a
12   point of saying you didn't have any deceptive intent here.
13   I just am trying to figure out what the legal standard is
14   here.  I -- we can look it up obviously, but is -- I mean,
15   is -- is it a subjective standard?  Am I supposed to look at
16   your -- your intent or not here?  Is that relevant?  And if
17   it is -- and it's like the follow up is if your mens rea is
18   relevant, is it a subjective standard or is it an objective
19   standard?
20        MR. RAMEY:  As with most sanctions motions, it
21   would be an objective standard that's applied to like a Rule
22   11 analysis so that whether there was actually -- that the
23   elements fit the unauthorized practice of law.
24        THE COURT:  Okay.  Do you have any case law that
25   tells us that it's an objective standard for unauthorized

26

1 practice?

2        MR. RAMEY:  I don't, your Honor.  I can -- but I

3 can provide that to the Court afterwards.  I didn't --

4        THE COURT:  Okay.

5        MR. RAMEY:  -- bring that.

6        THE COURT:  Now, we -- I mean, since we're talking

7 about unauthorized practice of law, the actual acts of

8 practicing law, those are intentional.  I mean, you don't

9 kind of accidentally practice law, right?

10     (Pause.)

11        THE COURT:  I mean, there is an intent to

12 undertake the actions which constitute the practice of law,

13 right?

14        MR. KUBIAK:  Yes, sir.

15        THE COURT:  I mean, I don't see any way you can

16 kind of stumble into accidentally practicing law.

17        MR. RAMEY:  No, your Honor.  I think there's

18 always a gray area when you talk about the USPTO

19 registration, and I think the Supreme Court has wrestled

20 with that about what constitutes the -- you know, whether or

21 not they're able to give opinions as to validity and claim

22 scope, and that's what that courts have said registered

23 patent attorneys are able to do.

24        THE COURT:  Claim scope and validity, sure.  Maybe

25 claim construction.  But infringement?  I'm not sure the

27

1  case law supports that.  And, also, you're not taking the

2  position that being members of the patent are -- allow you

3  to appear on pleadings in litigations in California?

4          MR. RAMEY:  Not at all, your Honor.

5          THE COURT:  No.  Okay.  All right.  Again, for

6  purposes -- in this case particularly, I think you said you

7  were on the pleadings for notice but this is also in order

8  to help out Ms. Kalra's personal situation, right?  I don't

9  want to get into detail on that.  Is that -- is that right?

10         MR. RAMEY:  Yes, your Honor.

11         THE COURT:  Okay.  So, that was basically covering

12 for her while she's going through this personal --

13         MR. RAMEY:  Yes, your Honor.

14         THE COURT:  -- these personal issues --

15         MR. RAMEY:  Yes, your Honor.

16         THE COURT:  -- where she can't work?  Okay.  So,

17 again, I just -- you put your names on the pleadings

18 purposefully.  It wasn't like an accident, right?  It was to

19 help her out, right?

20         MR. RAMEY:  It was -- they were personally -- they

21 were purposely, pardon me, your Honor, purposely put on the

22 pleadings.

23         THE COURT:  Okay.  So, the question I have is

24 before Ms. Kalra joined your firm, I think she represented

25 that she was either in a different firm or I know she was

28

1  your local counsel as like someone who was outside the firm

2  but acted as local counsel for your firm here in cases here.

3  Is that right?

4          MR. RAMEY:  That's correct, your Honor.

5          THE COURT:  Okay.  So, I mean, because Ms. Kalra's

6  -- I'm trying to be sensitive here.  Because Ms. Kalra has

7  her own personal situation here, you have the option of

8  associating in a different local counsel, right, when --

9  instead of putting your names on the pleadings, right?

10         MR. RAMEY:  Yes, your Honor.  We -- we quite

11 literally we were helping a colleague at the time.  So,

12 that's -- that's what we were doing.

13         THE COURT:  Yeah.

14         MR. RAMEY:  But, of course, we always had the

15 option of finding other counsel.

16         THE COURT:  All right.  So, in the OSC response,

17 you said that Ms. Kalra was acting as lead attorney on all

18 California matters?  So, when did she join the firm?

19         MR. RAMEY:  Your Honor, I'm sorry.  I -- it blends

20 again because we've worked with Ms. Kalra for a long time.

21         THE COURT:  Sure.

22         MR. RAMEY:  She would remember I'm certain.

23         MS. KALRA:  February 2023.

24         THE COURT:  Okay.  And, so, when you say in the

25 response that she was acting as lead attorney on all

29

California matters, that even includes matters where she was

co-counsel or local counsel before she officially joined the

firm?

MR. RAMEY:  I see your point now.  Yes, your

Honor.  She was the lead counsel on the --

THE COURT:  Okay.

MR. RAMEY:  -- matters even when she was with the

other firm.

THE COURT:  Okay.  And, again, I think we counted

upwards of 56 or more cases in this court where your firm

and Mr. Ramey's firm is listed as counsel.

So, Ms. Kalra, you were lead attorney in 56 cases?

MS. KALRA:  Over the course of years.

THE COURT:  Well, that's -- I'm just -- I mean,

probably 40 plus of them were just in the last two years.

MS. KALRA:  Yes.  And, of course, in consultation

with Mr. Ramey for most of them and Mr. Kubiak on a few.

THE COURT:  Okay.  And then, Ms. Kalra, in your

declaration you say -- this is on paragraph 20 -- it's

always been the practice of Ramey, LLP to work under my

California Bar admission on cases in California.  I'm not

aware of any case where I was not listed as the attorney of

record.

So, I mean, we've mentioned these cases I think, but

PacSec v. Juniper Networks, which is Docket Number 21-7812,

30

1  and NetSoc v. LinkedIn, which is Docket Number 20-483, in

2  both -- at least both those cases, only Mr. Ramey appears on

3  the pleadings.

4          MS. KALRA:  I think I was involved in -- I

5  remember one of those cases.

6          THE COURT:  But those are both cases in this

7  court.  So, I guess the -- I guess I'm trying to reconcile

8  your statement that you were lead counsel on all cases for

9  Ramey in California, but we found at least two where you

10 weren't on the pleadings anywhere.  You weren't on the

11 docket.

12         MS. KALRA:  Oh, so, I should probably qualify that

13 statement a little.  I was lead counsel for the cases in

14 which I either was an employee of Ramey, LLP or hired as

15 local counsel.  And, so, if I wasn't hired as local counsel

16 or the cases prior to the time I joined the firm, then my

17 name would not be on those pleadings.

18         THE COURT:  Okay.  But I -- no California Barred

19 lawyer is on those pleadings?  And I -- I know that they --

20 they do predate your joining the firm --

21         MS. KALRA:  Yes.

22         THE COURT:  -- but I don't know when -- maybe

23 that's -- when did you start working as co-counsel/local

24 counsel with the firm?

25         MS. KALRA:  I don't recall a specific date, but I

31

1 believe it was maybe 2020.

2          THE COURT:  Okay.

3          MR. RAMEY:  Your Honor, just to be very clear

4 about those two --

5          MS. KALRA:  Yes.

6          MR. RAMEY:  -- cases that you said that I appeared

7 without local counsel, those cases were transferred into

8 California and dismissed shortly thereafter.  We -- we never

9 -- that -- a court transferred those cases to California.  I

10 never officially entered an appearance in that court at all.

11 So, those would be two examples of one where I would enter

12 an appearance simply because it was sent there --

13          THE COURT:  Yeah.

14          MR. RAMEY:  -- but we would try to -- we got rid

15 of the cases shortly thereafter.

16          THE COURT:  Okay.  So, let -- let's talk about the

17 other issue which you've raised and it's in your OSC

18 response which you say that, Mr. Kubiak, Mr. Ramey, you have

19 been representing clients in California "under the

20 California Bar license of Ms. Kalra"?  I don't understand

21 what "under the Bar license of Ms. Kalra" means.

22          MR. RAMEY:  She's the -- the attorney -- the

23 attorney that's advising the California clients, and we're

24 simply providing services to the clients under the -- under

25 the guidance of Ms. Kalra.  It's her Bar license that --

32

1  she's the one -- the lead attorney.  She's the -- the

2  contact for that client.

3          THE COURT:  Okay.  So, help me out here.  Under

4  the -- I mean, you don't cite any law.  I mean, do the

5  California Ethics Rules allow out-of-state lawyers to

6  practice and advise clients about California litigation

7  under the Bar license of -- of a California Barred attorney

8  without getting admitted pro hac?

9          MR. RAMEY:  We were providing legal services to

10 Ms. Kalra at her request.  She's the one that's working with

11 the client.  So, that's -- that's how we did it, your Honor.

12 We weren't advising directly the clients without Ms. Kalra

13 being the one that was in charge of the overall

14 representation of the client in -- for California purposes.

15     Again, our representation was limited more towards what

16 the -- the claim scope was, the validity of the patent, and

17 what products might infringe, because of our USPTO Bar

18 registration.

19          THE COURT:  Well, at the last hearing, I think Ms.

20 Kalra represented that you, Mr. Ramey, have most of the

21 client contact with Doctor Gorrichategui, that she -- that,

22 for example, the work on the claims charts, deciding whether

23 or not to file cases.  That's your discussions with him?

24          MR. RAMEY:  That's correct, your Honor.

25          THE COURT:  Okay.  Well, then how are your -- how

33

1  is that operating under Ms. Kalra's Bar license?

2          MR. RAMEY:  She is the person that -- that assumes

3  responsibility for the representation of the client.  We

4  provide services for the client under Ms. Kalra's

5  representation, and that's services as we've talked about a

6  second ago.

7          THE COURT:  Okay.  So, just so I'm clear, no 56,

8  58 or whatever cases?  I mean, I think -- you say you've

9  been representing clients in California, but you've been

10 doing it through or under Ms. Kalra's Bar license.  Is that

11 the -- the -- the argument here?

12         MR. RAMEY:  Yes, your Honor.

13         THE COURT:  Okay.  Do you have any law that says

14 that that's allowed under the unauthorized practice of law

15 rules or case law?

16         MR. RAMEY:  I don't have it before me now.  I do

17 know that under -- that it was our -- it was our -- from

18 reading the California Rules previously, it was my

19 understanding that we could provide services as long as we

20 weren't holding ourselves out to be an attorney, as long as

21 we were practicing under the direction and guidance of Ms.

22 Kalra.  That was our understanding.

23         THE COURT:  Okay.  So, where does -- I guess I --

24 where does the phrase "under the Bar license" of another

25 lawyer come from?  Is that something from cases?  It sounded

34

1  like it came from some legal source.  Is that just a --
2  where did it come from I guess is the question?
3           MR. RAMEY:  I think I may have grabbed that -- my
4  thought may have come back from the Texas Rules of
5  Professional Conduct because they -- they -- recently the
6  Texas Supreme Court updated the Rules in Texas for Texas
7  lawyers, and they -- they didn't say under the Bar license
8  but under the guidance of a responsible attorney.  That may
9  have been where that came from.
10          THE COURT:  Okay.  Okay.  Sorry.  I'm circling
11 back a little bit.  So, in the OSC response, you said that
12 Mr. Ramey -- the decision was made by Mr. Ramey at the rest
13 of -- request of Doctor Gorrichategui in early '22 to
14 attempt to reduce costs by not automatically filing pro hac
15 vice applications.
16     I just want to be clear.  Mr. Ramey, was that your
17 decision alone, to not file the pro hac vice applications in
18 response to that request?
19          MR. RAMEY:  It had been our practice already to
20 which we were approved in cases, but we -- we had been
21 filing in some of them, and then he had asked us to stop.
22 So, I'm the one that made that decision, yes.
23          THE COURT:  Okay.  So, I just want to make sure.
24 Mr. Kubiak, were you involved in that decision?
25          MR. KUBIAK:  No, sir.

35

1          THE COURT:  Okay.  Ms. Kalra, were you involved in
2    that decision?

3          MS. KALRA:  No, your Honor.

4          MR. RAMEY:  She was not.

5          THE COURT:  Did any of the three of you have
6    discussion about that decision at any point?

7          MR. RAMEY:  I don't recall a discussion with --
8    with either Ms. Kalra or Mr. Kubiak.

9          THE COURT:  All right.  And the request from Mr.
10   Gorrichategui was in early '22, but you did submit a
11   declaration from him.  He doesn't make any mention of that.
12   I guess -- I guess the question is why -- since he made the
13   request, why wasn't it in his declaration?

14         MR. RAMEY:  We -- he made the specific -- his --
15   he was looking at it strictly for Rule 11 purposes.

16         THE COURT:  Yeah.

17         MR. RAMEY:  So -- so, I believe that was an
18   oversight on our part, your Honor.

19         THE COURT:  Okay.  All right.

20         MR. RAMEY:  But you have it in my declaration
21   and --

22         THE COURT:  No, no.  I just -- it was curious that
23   it's in your dec but the person who actually made the
24   request, you had his declaration.  I was curious why he
25   didn't say, Yes, I did say that.  It's kind of like triple

36

1  hearsay at some point, right?  That's fine.

2      Okay.  So --

3          MR. RAMEY:  Well, I mean, we can call Mr. -- get

4  Doctor Gorrichategui to submit a subsequent declaration that

5  this is -- this is what happened.

6          THE COURT:  I take -- I take your representation.

7      Okay.  So, again, just so I'm clear, the decision, at

8  least as of 2022 not to file pro hac vice applications was

9  to reduce costs.  That was the -- the motivating factor,

10  right?

11          MR. RAMEY:  That was a factor.  It was -- Doctor

12  Gorrichategui -- we -- we were already in the majority of

13  the cases not doing that, and then -- but he had asked us to

14  this.  So, yes, your Honor.

15          THE COURT:  Okay.  And, so, in the majority of the

16  cases where you already were not doing that, was that also

17  to reduce costs?

18          MR. RAMEY:  No, your Honor.  As I said before,

19  that was -- that was simply the -- we were waiting until we

20  were further in the case before we did that.  And that was

21  a --

22          THE COURT:  The cost issue was not -- not even a

23  factor in those earlier cases?

24          MR. RAMEY:  No, it wasn't, your Honor.

25          THE COURT:  Okay.  And did the -- did the not

37

1  filing of the pro hac vice applications and, therefore, not

2  paying the fees, did that reduce costs for your law firm as

3  well or would you always have gotten reimbursed by clients?

4          MR. RAMEY:  We would only be reimbursed for our

5  expenses if there was a recovery from the client for the --

6  for -- not for necessarily just that case but from the --

7  the -- whatever cases that particular LLC was filing.

8          THE COURT:  Okay.  Don't get into too much detail,

9  but I believe that your firm primarily works on contingency

10 basis?

11         MR. RAMEY:  A large portion of our work is

12 contingent based, your Honor.

13         THE COURT:  Okay.  So, there'd be a number of

14 cases where the pro hac vice application fees wouldn't get

15 reimbursed if the client doesn't get recovery from those

16 cases, right?

17         MR. RAMEY:  Well, your Honor, as I said, there

18 might be -- we typically seldom have only one or two cases

19 per client.  So, we -- you know, the expenses are -- I can't

20 count in any case except for -- that we weren't reimbursed

21 our expenses.

22         THE COURT:  All right.  And for the -- certainly

23 since the -- to be 100 percent clear on this, the decision

24 not to file the pro hac vice applications after early 2022,

25 that was not based on any kind of accounting error or

38

1  calendaring error?  It was -- it was a decision based on
2  that client's request, right?
3          MR. RAMEY:  Yes, sir.
4          THE COURT:  Okay.  All right.
5      Mr. Ramey, about how many times per year have you
6  traveled to California for work in the last couple of years?
7          MR. RAMEY:  This year, your Honor, this may only
8  be my second trip to California.  Last was in -- Judge
9  Holcomb in the Central District and then here, your Honor.
10  So, I think that's correct.  The prior years, I -- I can't
11  recall being in California in 2023.  I'm not saying I
12  wasn't, but I can't recall being in California.
13          THE COURT:  Mr. Kubiak?
14          MR. KUBIAK:  Yes, your Honor.  This case -- of
15  course, I'm here today -- and the pro hac appearance that I
16  made in the -- the one case, and I was not in California,
17  but I -- I'm counting the Zoom call as --
18          THE COURT:  Okay.
19          MR. KUBIAK:  -- being here.
20          THE COURT:  All right.  And going back let's say
21  in the last three, four years, have you met with clients in
22  California?
23          MR. KUBIAK:  No, sir.
24          MR. RAMEY:  No, your Honor.
25          THE COURT:  Okay.  Have you met with opposing

39

1 counsel and opposing parties in California?

2          MR. RAMEY:  No, your Honor.

3          MR. KUBIAK:  No, never.

4          THE COURT:  Okay.  Have you negotiated settlements

5 in California?

6          MR. RAMEY:  No, your Honor.

7          THE COURT:  Have you negotiated patent transfer,

8 monetization or sales or purchase agreements in California?

9          MR. RAMEY:  No, your Honor.

10          MR. KUBIAK:  No, sir.

11          THE COURT:  How many times have you taken or

12 defended depositions in California?

13          MR. RAMEY:  Never, your Honor.

14          MR. KUBIAK:  Never.

15          THE COURT:  How many times have you appeared in

16 hearings, oral argument, conferences in a California court?

17 Let's go like four or five years max.

18          MR. RAMEY:  Okay.  Your Honor, I can think of the

19 JIMSA case, and I was -- that was Judge Alsup, and I tend to

20 -- I believe I was admitted in that case.  I know you said I

21 wasn't.  So, I'm not going to question that, your Honor, but

22 -- but I did appear for hearings in this court.  So, I'm

23 fairly certain he had admitted me at some point.

24          THE COURT:  It's possible.

25          MR. RAMEY:  The -- the Judge Holcomb, we did a pro

40

1  hac vice down in the Central District when I -- when I had

2  to appear.  That was our -- our practice, and then this

3  Court, and you did a pro hac for us in a previous hearing I

4  understand.  And then Judge Tigar did a pro hac in that

5  case, and that -- '23.  So, I wasn't -- it was Zoom

6  hearings, your Honor.  So, I wasn't actually in California,

7  but I had probably, now that I think about it, probably four

8  or five hearings with Judge Tigar, but I was pro hac in

9  that.

10         THE COURT:  In the last four or five years, trials

11 in California, either of you?

12         MR. RAMEY:  No, your Honor.

13         MR. KUBIAK:  No, your Honor.

14         THE COURT:  Okay.  Arbitrations or mediations?

15         MR. RAMEY:  No, your Honor.

16         MR. KUBIAK:  No, sir.

17         THE COURT:  All right.  Settlement conferences?

18         MR. RAMEY:  No, your Honor.

19         MR. KUBIAK:  No.

20         THE COURT:  Going back to the physical offices,

21 both in Redwood City and Los Angeles, do either of you have

22 your own office within that location?

23         MR. RAMEY:  No, your Honor.

24         MR. KUBIAK:  No.

25         THE COURT:  I think Ms. Kalra described that she's

41

1  got a physical office.  Is it big enough to accommodate even

2  more than one attorney?

3         MR. RAMEY:  I think it would be.  Just it wouldn't

4  be comfortable.

5         THE COURT:  Well, are they separate offices for

6  different attorneys within the actual location?

7         MR. RAMEY:  It's just one office, your Honor

8         THE COURT:  Okay.  All right.  Speaking with Ms.

9  Kalra, the OSC response on page four says that Ms. Kalra was

10 not aiding or abetting the unauthorized practice of law as

11 she was always licensed.  Well, okay.  I mean, it's hard --

12 you can't -- that's such a response -- she can't really aid

13 and abet itself, right.  She's licensed, right.  The

14 question is since neither of you two are licensed, I didn't

15 see anything in the OSC response that separates -- let me

16 put it this way.  If, hypothetically, the Court finds that

17 there has been unauthorized practice of law here by either

18 of you two, is there a separate reason why Ms. Kalra should

19 not necessarily then be found to have been aiding and

20 abetting that?  Again, hypothetically in the first part.

21        MR. RAMEY:  I think that would be a -- a mens rea

22 where she would have to intentionally try to allow us on a

23 -- to commit the unauthorized practice of law.  And,

24 clearly, she was not trying to -- to cause us to commit the

25 unauthorized practice of law in the State of California.

42

 1          THE COURT:  Mr. Kubiak?

 2          MR. KUBIAK:  Your Honor, I tend to agree with Mr.

 3  Ramey.  I think she would have had to have had some intent

 4  to do it.

 5          THE COURT:  Okay.  All right.  Let's talk about

 6  number two, dismissal rule.  So, under Rule 41(a), we all

 7  know if you voluntarily dismiss a case twice, the second one

 8  acts as a judgment on the merits and bars the -- a third

 9  case.

10      So, Koji voluntarily dismissed the Colorado case -- we

11  call that the first case -- by notice under Rule

12  41(a)(1)(A)(I) and also then voluntarily dismissed what

13  we've been calling the second case here by notice under Rule

14  41(a)(1)(A)(I) as well.

15      So, I think I asked Ms. Kalra this.  At the time that

16  you filed the third complaint here, had you done any

17  research or analysis as to why that third complaint was not

18  barred by the two dismissal rule?

19          MR. RAMEY:  Yes, your Honor.  I knew from my years

20  of practice.  This is an issue that had came up early on in

21  my practice when I was in a firm called Mathews Joseph

22  Shaddox and Mason that they had dismissed some cases and

23  then weren't -- that's when we came to the Rule 41 rule,

24  that the second dismissal typical bars you.  But there's --

25  there -- as in most issues of law, there's -- there's

43

1  exceptions that -- that can allow it to be refiled.  And,
2  so, I knew that exists and actually would work in Doctor
3  Gorrichategui's cases.  This came back in some of the DATREC
4  cases, not the one that you're referencing that we needed to
5  look to whether we could refile that, and that's
6  -- that's where it came up again, and I saw that there were
7  all those exceptions.  So, I knew that there could.  And, as
8  we said in the pleadings, your Honor, the first dismissal we
9  filed based on what we thought was good venue from -- from
10  what you see in the pleadings, an image on their website
11  where they say they -- that that's the location of them, and
12  they then presented some affidavits.  And, so, it's not
13  that's an authorized salesperson.  And, so, we didn't think
14  we'd from that evidence.  We asked -- originally had asked
15  simply that we just transfer the case to California.  And
16  the Defendants wanted a dismissal.  That's fine.  We
17  dismissed it.  But that -- in my mind, that would be one
18  explanation of why that third -- why the -- that second 41
19  dismissal of the first California case wouldn't qualify as a
20  second dismissal on the merits.  That was the reason we --
21  we filed the third case.
22          THE COURT:  So, you don't cite any case law that
23  says a dismissal that's motivated by venue issues doesn't
24  count.  I mean, I say -- I think you say you -- you argue
25  that, right, that it shouldn't, but I didn't see any law

44

1   that says that that's one of the exceptions that you're

2   referring to.

3           MR. RAMEY:  Precisely, your Honor.  So, I knew the

4   law, and then later -- and when we -- when this Court

5   brought it up, we researched it again.  We verified that is

6   the law in California.  And, but, as I said in the

7   pleadings, after we started talking -- talking to the

8   Defendants' counsel, we went back and looked at that and

9   researched it, couldn't find anything directly on point, the

10  venue.  And, so, because of the -- not wanting to burden the

11  Defendant, we dismissed before they had to answer.  That was

12  100 percent exactly why we did that.

13      The -- you know, we -- we knew that generally you can.

14  You can make the argument to a court, and the court can

15  accept that argument or not is -- is what it sort of is

16  right now.  If you make -- if you show extraordinary -- I'm

17  not reading it right now, but it's basically if you show

18  circumstances that -- that merit the filing of the third

19  complaint, that there was something odd that happened in the

20  history, and I think the venue is something odd that

21  happens.  However, because, as I say in there, we -- we

22  looked hard for a case that was directly on point after

23  talking to -- to Defendants' counsel, and while we didn't

24  find anything, the client said just dismiss it.

25          THE COURT:  Yeah.  So -- okay.  So, I'm not really

45

1  that concerned about what you did post-complaint.  I'm
2  really more concerned about what you did in terms of
3  researching or looking into the issue when you file -- at
4  the time of or before you filed the third complaint.  I
5  mean, is there -- you didn't submit it, I assume.  There's
6  -- there's no memo that was filed.  There's no research
7  memo.  There's no billing records that show that you -- the
8  amount of work you did kind of thinking about and working on
9  the issue.  Is that --
10          MR. RAMEY:  No, your Honor, but I -- but I knew
11  the law.  I mean, the -- so, I mean, that's what you -- you
12  gain experience in the law from practicing.  So, I knew it
13  was something we could do, but -- but, as I said, when we
14  couldn't find that case exactly on point after Defendants'
15  counsel brought the issue up and our client said, Well, we
16  don't need to fight about fees.  Let's just dismiss it.  And
17  that was the -- that was the basis for it.
18          THE COURT:  Okay.  I mean, did you -- did you
19  consider the issue about the two dismissal rule before you
20  filed the third complaint?
21          MR. RAMEY:  Yes, your Honor.  We knew that it had
22  been dismissed before.
23          THE COURT:  Yeah.
24          MR. RAMEY:  We knew it had been dismissed.  We --
25  I mean, we did, in fact, ask that -- you know, that we just

46

1  transfer, but that -- that was -- and, fine, we'll dismiss

2  it.  We -- the venue rules in patent cases, as this Court's

3  aware, have become difficult.  And, so, when they put

4  forward a declaration, even though we had a website image,

5  that declaration's going to carry the day.  And then we

6  would be burdening the Court -- or burdening the Defendant

7  and the Courts with extra work.  So, we -- we thought what

8  we were doing was the least burdensome manner to get rid of

9  the case in Colorado.

10      And, in truth, as we look at it now, your Honor, our

11  true issue, the mistake we made is dismissing that first

12  Colorado -- the first -- pardon me -- the first California

13  case.  We should have -- we could have held onto that case

14  because we were -- the client had already identified that

15  product.  They didn't have it charted.  But, again, because

16  of the sales being $4,000 of that first product, we tried to

17  reduce the cost for everyone.

18          THE COURT:  Okay.  So -- okay.  So, before filing

19  the third complaint, you -- with regard to the two dismissal

20  rule, it was based on I think you said your experience of

21  just your general knowledge of the law, is that -- is that

22  right?

23          MR. RAMEY:  One hundred percent, your Honor.

24          THE COURT:  Okay.  And I think Ms. Kalra's

25  declaration says something to the same effect.  Did you two

47

1   talk about the issue before you filed the third complaint?

2           MR. RAMEY:  She -- I made her aware we were filing

3   the third complaint, yes.

4           THE COURT:  No, but I'm talking about the -- the

5   two dismissal issue specifically.  Did you talk about it?

6           MR. RAMEY:  I don't recall a specific conversation

7   on that.  I'm not going to say it didn't happen.  We have

8   lots of conversations about the cases that are going on and

9   the direction of the firm.

10          THE COURT:  Okay.  Ms. Kalra, do you have any

11  memory?

12          MS. KALRA:  I don't have a specific memory of that

13  particular conversation, and I agree with Mr. Ramey we

14  talked about a lot of things, and we talked frequently.

15          THE COURT:  Okay.  So, other than your opinions

16  and kind of based on your experience in the law, there's no

17  other -- you didn't -- like I said, you didn't cite any case

18  law?  There's not a legal basis for avoiding the two

19  dismissal rule other than your own beliefs at the time, is

20  that right?

21          MR. RAMEY:  No, your Honor.  In fact, we did cite

22  to the Court a case that's specifically out of California.

23  I'm sorry.  Now I'm forgetting where it is.

24          THE COURT:  The Mill Creek Athletics case that you

25  cite?  Is that what you're talking about?

48

1          MR. RAMEY:  Yes, your Honor.

2          THE COURT:  Yeah.  So, let's talk about that.  So,

3    Mill Creek Athletics was a case discussing whether costs and

4    fees should be awarded under Rule 41(d).  It doesn't ever

5    discuss whether a complaint is barred under Rule 41(a).  So,

6    I don't -- I don't understand how Mill Creek Athletics

7    provides a legal standard for filing a third complaint here.

8    And that case only involved a second complaint.

9          MR. RAMEY:  Your Honor, I -- I know I cited one in

10   here because that was the -- I know I talked about this.

11   you know what, your Honor?  It's in the -- it's in the

12   briefing on the response to the motion for fees.  It's on --

13   in the show cause response.  I noticed that when I was

14   preparing -- when I was reviewing this morning, that that --

15   there was a chunk of argument that could have been put in

16   this response as well.  But the case law is there.

17        This Mill Creek Athletic, I'm not recalling this case.

18   I thought that this case -- well, this one's -- this case

19   simply showed that, you know, that attorney's fees aren't

20   recoverable  and would be okay.  So, I am recalling that

21   case now.  But the -- the other one I know the briefing was

22   in the response to the motion for fees.  I don't think I

23   have that pulled up on my computer either because I -- I

24   didn't come with that.  So, I'm -- there is a -- there is a

25   case in that briefing, your Honor, that -- that's -- that's

49

1  the reason we did -- allowed it to happen.

2         THE COURT:  There's a case you cited in the

3  opposition to motion for fees that says you're allowed to

4  file a third complaint?

5         MR. RAMEY:  There's reason -- reasonable -- I

6  mean, I think it may be in here somewhere.  Pardon me, your

7  Honor.  I'm sorry.

8         THE COURT:  That's okay.  I'm -- that's why I'm

9  asking the question because I didn't see anything.

10         MR. RAMEY:  I apologize, your Honor.

11         THE COURT:  So, while you're pulling that up,

12  since you are referring to the motion for fees, I'll let Mr.

13  Kubiak jump in if he knows what case we're talking about.

14         MR. KUBIAK:  I'm not aware of any case cited on

15  that particular point, your Honor.  And, just to correct the

16  record, I don't believe -- my recollection is they never

17  offered to transfer the first case here.  They just

18  dismissed.  And I think there was representation that our

19  folks made, and I don't remember that happening.

20         MR. RAMEY:  In a phone conversation I had with Mr.

21  Cronacks (phonetic) about this, we had specifically said we

22  could dismiss this -- or agreed to a transfer, and he said

23  he'd rather we dismiss it.  We dismissed.  I think it was

24  within a day we dismissed.  So --

25         THE COURT:  All right.

50

1        MR. RAMEY:  I don't see it in my declaration, your

2  Honor.

3        THE COURT:  Your declaration only cites Mill Creek

4  Athletics.

5        MR. RAMEY:  But I know -- well, in the interest of

6  time -- we can certainly look at your opposition to the

7  motion.  You think it's somewhere in the opposition to the

8  motion for fees?

9        MR. RAMEY:  I thought it was, your Honor, but I

10  know I read the case in preparation for this hearing.  I

11  went back over that.

12        THE COURT:  Okay.  Let's -- so, in the current

13  record, there's no case law that you're able to cite to me

14  that says what the standard is and why you're allowed to

15  file a third complaint after voluntarily dismissing the

16  first two, right?

17        MR. RAMEY:  Your Honor, no.  It's -- it's in the

18  -- the pleadings to the Court.  I just -- I'm sorry.  I

19  can't --

20        THE COURT:  Okay.  We'll look in your opposition

21  brief on the motion for fees and go from there.

22     And then in the opposition -- not the opposition.  In

23  the OSC response, at page 14, you said the dismissal in

24  Colorado was more akin to convenience.  Again, I -- you

25  don't cite any law.  Is there any law that says that a

51

1 dismissal for convenience doesn't count for Rule 41

2 purposes?

3          MR. RAMEY:  No, your Honor.  There -- what it

4 says, there's law that -- that I cite in the pleading.  In

5 the pleadings it says that absent special circumstances, you

6 know, you can't file a third complaint.  The second one

7 operates as a dismissal with prejudice.  That's what the law

8 is, and it's -- I cited a Ninth Circuit case for that.  But

9 I'm not seeing it right now, your Honor.

10     The -- and I'm sorry if I've forgotten your exact

11 question.  I apologize.

12          THE COURT:  There's no -- you used the phrase

13 dismissal for convenience.  I just wanted to make sure.

14 There's no law that says a dismissal for -- I don't even

15 know what a dismissal for convenience is.  It's not a --

16 it's not in the Rules, but a dismissal for convenience is

17 not exempt from the two dismissal rule under Rule 41, is it?

18          MR. RAMEY:  I think it could be because it would

19 be one of those special circumstances that we were talking

20 about, your Honor, that -- that's allowed.

21          THE COURT:  Okay.  So, if you've got case law in

22 the opposition to the motion for fees that addresses that,

23 we'll look for it.

24     And, also, you know, I think you say in the OSC

25 response and I think Mr. -- sorry -- Gorrichategui --

1          MR. RAMEY:  Yes, your Honor.

2          THE COURT:  -- says in his declaration that you --

3  "Mr. Ramey informed me that we would likely lose the venue

4  motion," which is why he authorized the dismissal of the

5  Colorado case.  So, I mean, if there was a recognition

6  internally on your side that you'd likely lose the venue

7  motion, it's not really -- it's not really a dismissal for

8  convenience, right?  I mean, it's a tactical decision that

9  you're going to lose the venue issue.

10          MR. RAMEY:  No, your Honor.  I'd strongly disagree

11  with that.  We were trying to save the parties resources

12  because starting a venue fight means we're going to have to

13  conduct discovery.  That was the -- you know, discovery of

14  -- discovery of -- of Koji's people then, so, to avoid that.

15  That was the basis for it.  So, it is -- and the convenience

16  would mean so we don't have to go into the venue discovery.

17  They said, Hey, California's the right place for this suit

18  to be.  So, that's what -- that's what I meant by that is

19  that it is for saving the parties resources, which is what

20  -- what I thought the -- the law tried to do is encourage

21  counsel to discuss matters with one another in hopes of

22  justice and speedy resolution.  So, we were simply trying to

23  reduce the -- the burdens for everyone.

24          THE COURT:  Okay.  So, you're not relying -- just

25  so I'm clear, because you do cite it in the OSC response in

53

1   your declaration.  You're not really relying on

2   Mill Creek Athletics as authority for the filing of the

3   third complaint, right?  Because that's a fees and cost

4   case.  It's not a barred complaint case.

5           MR. RAMEY:  Right.  But I'd have to go back and

6   see.  It might also cite the -- the standard for that.  I

7   don't recall off the top of my head, but I know that the --

8   I just read the -- the case, you know, in the last couple of

9   days, the case law about that.

10          THE COURT:  Okay.  You also in the OSC response

11  make note that a third complaint charted a different product

12  than that was charted in the second case and even in the

13  first case, the same.  Is there any law that you cited that

14  says -- or that you know of that says that the third

15  complaint isn't barred because it's charting different

16  products, even though it's the same party, same patent?

17          MR. RAMEY:  No, your Honor.  I'd say the law is

18  there's reasonable explanation that can be made that does

19  allow the third case.  I wouldn't say that it's because it

20  was a new product.  That was just one of the other

21  additional factors that could go to allowing you to file --

22  file that third complaint.  That's all.

23          THE COURT:  Okay.  And, again, is that -- we'll

24  have to look at whether the case law in your opposition to

25  the motion for fees goes to that issue.

54

1    Okay.  Ms. Kalra, in your declaration -- it's not in

2 the OSC response.  At paragraph 27 of your declaration, you

3 said that there are exceptions that allow the refiling of a

4 complaint where previous dismissal was made pursuant to

5 stipulation, but you don't cite any case law on that.

6 What's -- what's your support for that assertion?

7         MS. KALRA:  It's actually in Rule 41, and I think

8 it is (a) -- (a)(1)(A)(ii).

9         THE COURT:  Okay.  So, but --

10         MS. KALRA:  But I -- I do see that -- after I

11 looked at the law, subsequently, I did see that it has to be

12 signed by both parties.

13         THE COURT:  That's what a stipulation is, right?

14         MS. KALRA:  Correct.  Well, a stipulation can also

15 be an agreement that's not necessarily executed by people.

16 I mean, I've seen stipulations by email where everybody

17 says, Do you stipulate?  Yes.  So --

18         THE COURT:  But that's deemed a signature because

19 it -- it's a confirmation.

20         MS. KALRA:  Correct.

21         THE COURT:  Right.  So, but you talk about

22 exceptions for dismissals by stipulation, but how is that

23 relevant to the issues here?  There was no -- none of the

24 prior dismissals were by stipulation.

25         MS. KALRA:  So, it was my understanding that the

55

1  prior -- that the dismissal in Colorado -- I wasn't involved

2  in the Colorado case itself, but it was my understanding

3  that the dismissal in the Colorado case was by agreement

4  between the parties, and I probably, you know, should have

5  looked a little harder at that, but I took that at face

6  value.

7          THE COURT:  Okay.  I mean, the document says what

8  it says, but I'll say it.  It -- it is a notice of

9  dismissal.  It's only signed by Mr. Ramey.  It's not signed

10 by -- by opposing counsel.  So, I -- does the -- the

11 stipulation issue, I mean, is it even germane here?

12         MS. KALRA:  Only as far as that was my

13 understanding initially was that everyone had agreed to the

14 dismissal.

15         THE COURT:  Okay.  But the actual dismissal is not

16 a stipulation.  It's a notice of dismissal.  I mean, pull it

17 up.  It's a notice of dismissal.

18         MS. KALRA:  Correct.  And I -- and I know that

19 sort of in -- having looked at it but not on the spur of the

20 moment.

21         THE COURT:  Okay.

22         MS. KALRA:  So, I looked at it a little bit later

23 than the initial filing.

24         THE COURT:  Okay.  Okay.  Very briefly, and this

25 is because in the interest of time, on the prefiling

56

1 analysis with regard to infringement, Mr. Ramey, the OSC

2 response is -- and I take it that you -- you had taken the

3 position that the claims had their plain and ordinary

4 meaning before you filed the third complaint, right?

5          MR. RAMEY:  Under the Federal Circuit law, the

6 heavy bias towards that, yes, your Honor.

7          THE COURT:  Okay.  And, again, you didn't submit

8 anything.  Is -- is there any written work product that is

9 -- that precedes the filing of the third complaint that --

10 that shows that -- the analysis to make sure that it is

11 plain and ordinary meaning?

12          MR. RAMEY:  Yes, your Honor.  Our comparison of

13 the claims -- the claim elements are in the claim chart from

14 the patent, and then -- from our reading of the patent and

15 from our reading as applied to the accused device.

16          THE COURT:  But there's no -- I mean, the claims

17 chart is an infringement chart.  There's no claim

18 construction column, right?

19          MR. RAMEY:  But I don't -- I don't understand what

20 the Court means, and we do have a column with the claim

21 elements.

22          THE COURT:  Yeah.

23          MR. RAMEY:  And then the -- the accused elements

24 from the Defendant's accused instrumentality with a

25 description of why we think that element is met in -- in

57

1  each instance.

2      But I think Mr. Kubiak wants to add something, your

3  Honor.

4          MR. KUBIAK:  Yes, your Honor.  With regard to the

5  claim charts and infringement analysis, many times that

6  would be me, but -- and I would have to go through the

7  specification because sometimes the -- the claim charts are

8  confusing at best.  And, so, I have to go back and figure

9  out what the -- as far as is there something in the file,

10 written analysis.  Usually I'll do it on a yellow pad, and

11 when I'm done, I'm done, and I -- I don't keep those.  Once

12 I'm satisfied with whatever claim construction it is, that's

13 -- that's pretty much the end of it.  And, so, then I --

14 then I would go through and compare it to whatever the

15 device is.

16         THE COURT:  Okay.  So, actually -- actually, it

17 was a little bit unclear to me because there's reference to

18 Mr. Sanatori (phonetic).  In the claims chart for the third

19 complaint, did you work on that or Mr. Ramey or --

20         MR. KUBIAK:  For the third complaint, that would

21 have been Mr. Ramey.

22         THE COURT:  Okay.  You worked on the one for the

23 first and second complaints?

24         MR. KUBIAK:  That's correct.

25         THE COURT:  Okay.

58

 1          MR. RAMEY:  And I worked on -- I didn't mean to

 2 cut you off.

 3          THE COURT:  No.  Just that -- so, I was going

 4 where I think you were going to go, just was there

 5 collaboration between the two of you on any of the charts

 6 that the other one was working on?

 7          MR. RAMEY:  Yes.  We 100 percent certainly look at

 8 each other's work.

 9          MR. KUBIAK:  Many times, yes.  It might not be as

10 detailed as -- as providing him here's -- here's my basis

11 for it, as opposed to just sitting down.  Typically we take

12 all day Tuesday to go over whatever we're going over and

13 just say, Here's what I found.  This is what I think.

14          MR. RAMEY:  So, certainly.  And that actually is a

15 good point Mr. Kubiak brings up.  We do in the firm exactly

16 for this purpose have Tuesdays set aside for -- for meetings

17 where we go through every case that's in the firm and then

18 look at every issue, look at the case, because we don't want

19 to miss any of these issues or have something inappropriate

20 occur.

21          THE COURT:  And I think in the OSC response you

22 say on page 16 that there are two situations where a claim

23 term can deviate or not be its plain ordinary meaning.

24 That's where the patent case and lexicographer or the term

25 so deprives the claim of clarity that there's no means by

59

1  which the scope may be ascertained from the language used,

2  which I think you were referring to.  So, that's the way you

3  -- you went through those two and then decided that neither

4  of them applied, so you could use plain and ordinary

5  meaning.  Is that for the --

6              MR. KUBIAK:  Yes, sir.

7              THE COURT:  -- charts?  Is that --

8              MR. RAMEY:  Yes, your Honor.

9              THE COURT:  Okay.  And I think you say it, I just

10  want to be 100 percent clear.  Ms. Kalra didn't work on any

11  of the claims terms for any of the complaints, right?

12              MR. RAMEY:  She would --

13              MR. KUBIAK:  She did not work on the claim chart.

14  She would accept whatever we told her as -- as accurate.

15              THE COURT:  Okay.  All right.

16      Ms. Kalra, I think your declaration says that you

17  relied on -- for the claims charts, you relied on Mr. Ramey

18  for the third complaint and I assume Mr. Kubiak for the

19  second complaint.  Is that right?

20              MS. KALRA:  That's correct, but I reviewed them

21  before they got filed to just double check that we had

22  everything in the claim charts that we need to have in in

23  the exhibit.

24              THE COURT:  Okay.  How much time did you spend

25  reviewing the claims charts?

60

1        MS. KALRA:  I looked at the claim charts.  I
2  looked at the patent, about an hour and a half.
3        THE COURT:  And for the third complaint, Mr.
4  Ramey, about how much time did you spend on that claims
5  chart?
6        MR. RAMEY:  Your Honor, I spoke with Doctor
7  Gorrichategui and with Mr. Sanatori.  So, Mr. Sanatori works
8  for Doctor Gorrichategui.  We discussed that claim chart for
9  approximately an hour and a half when they first presented
10  it to me.  The question I asked back to them is was this
11  product included with the previous claim chart, and -- and
12  then they said no, and they didn't think it was part of the
13  -- the sales stream we had because it wasn't included
14  before, and we checked our emails, saw that it likely wasn't
15  included in the prior numbers that came from Renesas.  And
16  then I went back to the claim chart again, looked at it,
17  made sure all the elements were -- were addressed by their
18  plain and ordinary meaning.  Probably at that point it was
19  another 45 minutes.  So, it's total about two hours and
20  fifteen minutes.
21        THE COURT:  Okay.  And, Mr. Kubiak, about how much
22  time did you spend conferring on the third complaint's claim
23  chart?
24        MR. KUBIAK:  On the third complaint?  Very little.
25  I mean, I knew what was going on, but as far as really

1 talking about it, that was pretty much between Mr. Ramey and

2 Ms. Kalra.

3            THE COURT:  Okay.  And how much time did you spend

4 on the claims chart that was attached both in the first case

5 and --

6            MR. KUBIAK:  One and two?

7            THE COURT:  Yeah, first and second complaints.

8            MR. KUBIAK:  For the -- for the very first claim

9 chart, I probably spent six, seven hours on it.  Mr.

10 Sanatori is very bright, but I don't always agree with him.

11            THE COURT:  And I think I asked Ms. Kalra this in

12 the last hearing.  I wasn't sure she knew the exact answer.

13 Mr. Sanatori is not a patent agent?  He's not a member of

14 the Patent Bar?

15            MR. KUBIAK:  As far as I know he is not.

16            THE COURT:  He's not a lawyer?

17            MR. KUBIAK:  No.

18            THE COURT:  Okay.

19            MR. RAMEY:  No, no, no.  He -- I think he -- in

20 his declaration, he specifies his technical experience.  He

21 has 20 years doing this type of work, but -- but you're

22 right.  That's why Mr. Kubiak and I and Ms. Kalra, you know,

23 we review what he does, and we don't accept it at face

24 value.

25            THE COURT:  Okay.  All right.  Let me just make

62

1  sure I don't have any other questions.  Okay.

2      So, last chance.  Any other matters, anyone, Ms. Kalra

3  as well, want to bring to my attention or raise with the

4  Court that you haven't had a chance to?

5          MR. RAMEY:  No, your Honor.  I'd simply like to

6  say on behalf of me and Mr. Kubiak and my firm and Ms. Kalra

7  that I -- we never intended to get Ms. Kalra in any issues

8  with the California State Bar, and we never, as our law

9  firm, intended to practice law in California.  And, so, we

10 -- we -- we do -- we do tell the Court that we've changed

11 our practices.  We -- we made a mistake.  We accept that

12 fact.  We've -- we've done what we can to fix that and

13 rectify it going forward.  It won't -- won't happen again,

14 unless we can get a license or in cases we get admitted pro

15 hac vice.

16         THE COURT:  You're always free to take the

17 California Bar exam.  Nothing's stopping you from doing

18 that.

19         MR. RAMEY:  I've thought about it many times, your

20 Honor.

21         MR. KUBIAK:  Too old, sir.

22         THE COURT:  I didn't really probe this, but --

23 because it's not -- it's more what you're going to be doing

24 going forward.  Is it your going forward practice going to

25 be that -- I understand nobody's going to be on the

63

1  pleadings unless they're either already going to be admitted

2  pro hac or -- or they're already a member of the California

3  Bar, right?  But are you also going to work on the case from

4  Texas and just funnel everything to Ms. Kalra without being

5  on the pleadings?  Is that the -- is that -- she can't work

6  on the cases alone, right?

7          MR. RAMEY:  She will handle the legal

8  representation of the case, and we would be involved in

9  assisting her with the technical aspects of the case.  The

10 client is based in Texas.

11          THE COURT:  Yeah.

12          MR. RAMEY:  And we'd be advising the client there

13 for -- for that purpose on infringement, but all the legal

14 analysis, anything that would have to be in California would

15 go through Ms. Kalra.

16          THE COURT:  That includes claims charts for

17 complaints in the future or for infringement contentions,

18 right?

19          MR. RAMEY:  She --

20          THE COURT:  I mean, she can't draft those from

21 scratch herself, right?

22          MR. RAMEY:  Well, correct, but she -- right now,

23 so, it's her current practice that she looks at everything.

24 She has the -- the say before -- if she doesn't like a claim

25 chart, it won't get filed.

64

1          THE COURT:  Okay.

2          MR. KUBIAK:  I see our position as being like her

3   law clerk essentially.

4          THE COURT:  Okay.  I think I've asked this, but do

5   you know of any California ethics opinions that allow you to

6   do that, that is, prepare documents for her that she will

7   review but then file in California courts but that's not --

8   that doesn't count as the unauthorized practice of law here?

9   Because it's -- it goes beyond simply advising the client,

10  right?  You're preparing documents that you know are

11  intended to be filed in a California court.

12         MR. RAMEY:  We're providing the -- the services of

13  Mr. Sanatori, they were helping prepare something that she

14  has the final say on approving.

15         THE COURT:  Yeah.

16         MR. RAMEY:  We -- we use our experience as

17  registered patent agents to do that and our experience with

18  the client.

19         THE COURT:  But just more specifically, because

20  they -- did you cite -- are you aware of, because you didn't

21  cite any -- are you aware of any law, any California ethics

22  opinions, anything that allow you to do that work knowing

23  that it's going to be intended to be filed in a California

24  court and where the State Bar has said, yes, that's not the

25  unauthorized practice of law?

65

1          MR. RAMEY:  I'm not -- I'm not aware of an

2   opinion, your Honor, that says that -- I'm not aware of any

3   specific opinion on that issue.

4          THE COURT:  Okay.  All right.  Mr. Crotty, I'll

5   give you one chance to speak, only if it deals with the

6   motion for fees, though, because that -- there has been some

7   discussion.

8          MR. CROTTY:  Just as a factual matter, most of the

9   communications on this case are about settlement.

10          THE COURT:  Yeah.

11          MR. CROTTY:  And I don't know where that falls in

12  terms of like -- I know they're going to change the

13  pleadings but the substance of who's doing what, most of my

14  interactions were with Mr. Ramey, mostly over email, joint

15  documents, settlement offers, that sort of thing.  So, I

16  don't know what side of the line that falls in.

17      And then as to the fees motion, the only thing I would

18  like to say is that we would consider this part of the

19  manner of litigation that's relevant under Octempics

20  (phonetic), and that's it.

21          THE COURT:  Okay.  Well, the fee -- from the

22  Court's point of view, the fees motion is submitted.  So, I

23  don't want to supplement the record any further.  I just

24  wanted to give you a fair chance to talk because there has

25  been some discussion of it.

66

1      Okay.  Are we submitted on the OSC?  Anything further?

2            MR. RAMEY:  Just one second, your Honor.

3            THE COURT:  Sure.

4            MS. KALRA:  May I speak with Mr. Ramey for just a

5  second?

6            THE COURT:  Sure.

7            MS. KALRA:  Thank you.

8      (Pause.)

9            MR. RAMEY:  Your Honor, we'd request leave of the

10  Court to file the additional authority on the Rule 41,

11  because I know we cited it in briefing.  So, I would just

12  present the case, no argument on it, just present the case

13  to the Court.

14            THE COURT:  Well, if you're sure it's in the

15  motion for fees, we'll pick it up that way.

16            MR. RAMEY:  I thought it was, your Honor.  But I'm

17  just asking -- I'm still asking for motion for leave just to

18  submit that supplemental authority.

19            THE COURT:  You can submit it, but you have to

20  point to where it is in the motion for fees, right, because

21  that was the representation.  I don't want you -- at this

22  point, I mean, you've already filed your written response.

23  I don't want you going out doing -- you should have found

24  case -- I think you would have found cases by now if you had

25  any.  So, yeah, you can -- you can submit the additional

67

1  authority --

2          MR. RAMEY:  Thank you, your Honor.

3          THE COURT:  -- without argument.

4      Okay.  Any -- other than that, submitted?

5          MR. RAMEY:  Yes, your Honor.

6          THE COURT:  Okay.  Anything further from you, Ms.

7  Kalra?

8          MS. KALRA:  No, your Honor.

9          THE COURT:  Okay.  Mr. Kubiak?

10          MR. KUBIAK:  No, sir.

11          THE COURT:  Mr. Crotty?

12          MR. CROTTY:  No, your Honor.

13          THE COURT:  Okay.  We're adjourned till the next

14  matter, and an order will issue, you know, in due course.

15      Ms. Kubiak, as to your administrative motion to seal

16  your supplemental declaration --

17          MR. KUBIAK:  Ms. Kalra.

18          THE COURT:  Am I --

19          MR. KUBIAK:  No.  It's Ms. Kalra.

20          THE COURT:  Sorry.  I thought I said Kalra.  Ms.

21  Kalra, as to your administrative motion, I'm going to deny

22  in part and grant in part.  What I --

23          MS. KALRA:  Okay.

24          THE COURT:  There's parts of that declaration that

25  are -- that actually go to the -- the OSC response, but

68

1  parts go to your personal issues.  So, submit a proposed

2  redacted version that redacts whatever you consider to be

3  truly personal --

4          MS. KALRA:  Right.

5          THE COURT:  -- information, and then the Court

6  will consider it.

7          MS. KALRA:  Thank you very much, and I appreciate

8  that.

9          THE COURT:  All right.  I think in the proceedings

10 today that covers everything.  So, anything further from

11 anyone?

12         MR. RAMEY:  Nothing from Plaintiff, your Honor.

13         MR. KUBIAK:  No, your Honor.

14         THE COURT:  Okay.  Thank you.

15         MR. RAMEY:  Thank you.

16         THE COURT:  Thank you for your time.

17         THE CLERK:  We're off the record in this matter.

18     (Proceedings adjourned at 11:50 a.m.)

19

20

21

22

23

24

25

69

CERTIFICATE OF TRANSCRIBER

        I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by
the U.S. District Court, Northern District of California, of
the proceedings taken on the date and time previously stated
in the above matter.

        I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.

                Echo Reporting, Inc., Transcriber

                  Monday, September 30, 2024

# EXHIBIT B

| # | CASE | CASE NO. | FILING DATE | Counsel for Plaintiff and Defendant | Lawyer not licensed in CA on pleadings | Pro hac vice anticipated | PHV | Date of Transfer | DATE CLOSED |
|---|------|----------|-------------|-------------------------------------|----------------------------------------|--------------------------|-----|------------------|-------------|
| 1 | Esignature Software, LLC v. Adobe, Inc. | 3:22-cv-05962 | 12/13/22 | Pla: Susan Kalra<br><br>Def: Michael A. Berta | Yes | Yes | No | 10/12/2022 From WDTX | 02/22/2023 |
| 2 | Haley IP, LLC v. Motive Techs., Inc. | 4:23-cv-02923 | 6/14/23 | Pla: Susan Kalra<br><br>Def: Glenn T Graham | Yes | Yes | Yes | 06/14/2023 From WDTX | 11/30/2023 |
| 3 | Escapex IP LLC v. Google LLC | 3:22-cv-08711 | 4/08/22 | Pla: Susan Kalra<br><br>Def: Slayden Grubert | Yes | Yes | No | 12/15/2022 From WDTX | 03/07/2023 |
| 4 | ALD Social LLC v. Verkada, Inc. | 3:23-cv-00049 | 1/5/23 | Pla: Susan Kalra<br><br>Def: Heidi L. Keefe | Yes | Yes | No | 01/05/2023 From WDTX | 02/24/2023 |
| 5 | Missed Call, LLC v. Twilio Inc. | 3:24-cv-00681 | 10/24/23 | Pla: Susan Kalra<br><br>Def: Chris R Schmidt | Yes | Yes | No | 02/06/2024 From WDTX | 04/23/2024 |
| 6 | NetSoc, LLC v. LinkedIn Corp | 3:20-cv-00483 | 12/26/18 | Pla: William P. Ramey | Yes | Yes | No | 01/23/2020 | 06/26/2020 |

| | | | | | | | | From SDNY | |
|---|---|---|---|---|---|---|---|---|---|
| 7 | WirelessWerx IP, LLC v. Google, LLC | 4:23-cv-01852 | 4/17/23 | Pla: William P. Ramey<br><br>Def: Amy K Liang | No | No | No | 04/17/2023 From WDTX | 02/28/2025 |
| 8 | Riggs Tech. Holdings, LLC v. Vagaro, Inc. | 3:21-cv-07927 | 10/8/21 | Pla: Susan Kalra<br><br>Def: Sal Lim Kramer | Yes | Yes | No | n/a | 01/07/2022 |
| 9 | Valjakka v. Netflix, Inc. | 4:22-cv-01490 | 3/9/22 | Pla: Susan Kalra<br><br>Def: Elise Sabrina Edlin | Yes | Yes | Yes | 03/09/2022 From WDTX | |
| 10 | Traxcell Techs., LLC v. Google LLC | 3:22-cv-04807 | 8/22/22 | Pla: Susan Kalra<br><br>Def: David A. Caine | Yes | Yes | Yes | 08/22/2022 From WDTX | 01/27/2023 |
| 11 | WirelessWerx IP, LLC v. Uber Techs., Inc | 3:23-cv-00990 | 3/3/23 | Pla: Susan Kalra<br><br>Def: Heidi L. Keefe | No | Yes | No | 03/06/2023 From WDTX | 06/02/2023 |

| 12 | Silent Commc'n, LLC v. Adobe, Inc | 3:23-cv-02696 | 5/31/23 | Pla: Susan Kalra<br><br>Def: Eugene Y. Mar | Yes | Yes | No | 05/31/2023 From WDTX | 10/20/2023 |
|----|----|----|----|----|----|----|----|----|----|
| 13 | ALD Social, LLC v. Apple, Inc | 3:23-cv-02695 | 5/31/23 | Pla: Susan Kalra<br><br>Def: Asim Zaidi | Yes | Yes | No | 05/31/2023 From WDTX | 10/03/2023 |
| 14 | Safecast Ltd. v. Google, LLC | 5:23-cv-03128 | 6/23/23 | Pla: Susan Kalra<br><br>Def: Amy K Liang | Yes | Yes | No | 06/26/2023 From WDTX | 11/28/2023 |
| 15 | Ask Sydney, LLC v. Google, LLC | 3:23-cv-03955 | 8/8/23 | Pla: (nothing filed in CA)<br><br>Def: Asim M. Bhansali | No | No | No | 08/08/2023 From WDTX | 10/18/2023 |
| 16 | Flick Intelligence, LLC v. Google, LLC | 3:23-cv-04803 | 9/19/23 | Pla: Susan Kalra<br><br>Def: Bill Trac | Yes | Yes | No | 08/08/2023 From WDTX | 10/18/2023 |
| 17 | Fare Techs. LLC v. Lyft, Inc | 3:23-cv-04935 | 9/26/23 | Pla: Susan Kalra<br><br>Def: Bethany Salpietra | Yes | Yes | No | 09/26/2023 From WDTX | 10/29/2024 |

| 18 | Vilox Techs., LLC v. Salesforce, Inc | 3:23-cv-05047 | 10/2/23 | Pla: Susan Kalra<br><br>Def: Jose Carlos Villarreal | Yes | Yes | No | 10/02/2023 From WDTX | |
|----|----|----|----|----|----|----|----|----|----|
| 19 | SmartWatch MobileConcepts, LLC v. Google | 3:24-cv-00937 | 2/16/24 | Pla: Susan Kalra<br><br>Def: Sorin G. Zaharia | Yes | Yes | No | 02/16/2024 From WDTX | 09/03/2024 |
| 20 | WirelessWerx IP, LLC v. Lyft, Inc. | 5:24-cv-01144 | 2/26/24 | Pla: Susan Kalra<br><br>Def: Jose Carlos Villarreal | Yes | Yes | No | 02/26/2024 From WDTX | 11/04/2024 |
| 21 | Autonomous IP, LLC v. Lyft, Inc | 3:24-cv-03348 | 6/4/24 | Pla: Susan Kalra<br><br>Def: Jeremy J. Taylor | Yes | Yes | No | 06/04/2024 From WDTX | 11/21/2024 |
| 22 | CyboEnergy, Inc. v. Duracell Power Center, LLC | 3:24-cv-08891 | 12/10/24 | Pla: William P. Ramey | Yes | Yes | Yes | n/a | 03/13/2025 |
| 23 | WirelessWerx IP, LLC v. Zipline International, Inc. | 3:24-cv-08462 | 11/26/24 | Pla: William P. Ramey<br><br>Def: Case Collard | Yes | Yes | Yes | n/a | 03/21/2025 |
| 24 | Kephart Consulting, LLC | 4:24-cv-06770 | 9/26/24 | Pla: William P. Ramey | Yes | Yes | Yes | n/a | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | v. AxxonSoft US, Inc. | | | Def: William H Mandir | | | | | |
| 25 | VDPP, LLC v. Roku, Inc. | 5:24-cv-05303 | 8/16/24 | Pla: Susan Kalra | Yes | Yes | No | n/a | 12/11/2024 |
| 26 | mCom IP, LLC v. WestAmerica Bancorporation | 3:24-cv-03609 | 6/14/24 | Pla: Susan Kalra | Yes | Yes | No | n/a | 07/25/2024 |
| 27 | Linfo IP, LLC v. Alibaba Group (U.S.) Inc. | 4:24-cv-03098 | 5/22/24 | Pla: Susan Kalra<br>Def: Bo Bryan Jin | Yes | Yes | No | n/a | 11/15/2024 |
| 28 | WFR IP, LLC v. Alibaba Group (U.S.) Inc. | 3:24-cv-02179 | 4/12/24 | Pla: Susan Kalra | Yes | Yes | No | n/a | 08/27/2024 |
| 29 | Linfo IP, LLC v. Third Love, Inc. | 4:24-cv-02195 | 4/12/24 | Pla: Susan Kalra<br><br>Def: Neil J. McNabnay | Yes | Yes | No | n/a | 10/14/2024 |
| 30 | Flick Intelligence, LLC v. HTC America, Inc. | 5:24-cv-02201 | 4/12/24 | Pla: Susan Kalra | Yes | Yes | No | n/a | 08/12/2024 |
| 31 | PacSec3, LLC v. Radware, Inc. | 3:24-cv-02146 | 4/10/24 | Pla: Susan Kalra | Yes | Yes | No | n/a | 09/05/2024 |
| 32 | VDPP, LLC v. Xiaomi USA LLC | 5:24-cv-01783 | 3/22/24 | Pla: Susan Kalra<br><br>Def: Jie Li | Yes | Yes | No | n/a | 09/04/2024 |

| 33 | VDPP, LLC v. Vivitek Corporation | 5:24-cv-01781 | 3/22/24 | Pla: Susan Kalra<br><br>Def: Charles S. Barquist | Yes | Yes | No | n/a | 08/08/2024 |
| 34 | VDPP, LLC v. Motorola Mobility LLC | 3:24-cv-01672 | 3/18/24 | Pla: Susan Kalra | Yes | Yes | No | n/a | 04/23/2024 |
| 35 | WirelessWerx IP, LLC v. Wing Aviation, LLC | 4:24-cv-01040 | 2/21/24 | Pla: Susan Kalra<br><br>Def: George Thomas Lyons , III | Yes | Yes | No | n/a | 04/24/2024 |
| 36 | Missed Call, LLC v. RingCentral, Inc. | 3:23-cv-06728 | 12/31/23 | Pla: Susan Kalra<br><br>Def: Michael T. Renaud | Yes | Yes | No | n/a | 03/11/2024 |
| 37 | Missed Call, LLC v. 8x8, Inc. | 3:23-cv-06723 | 12/30/23 | Pla: Susan Kalra<br><br>Def: James Warren | Yes | Yes | No | n/a | 03/07/2024 |
| 38 | WirelessWerx IP, LLC v. OnFleet, Inc. | 3:23-cv-06724 | 12/30/23 | Pla: Susan Kalra<br><br>Def: Albert Tong | Yes | Yes | No | n/a | 09/13/2024 |
| 39 | WirelessWerx IP, LLC v. Life360, Inc. | 3:23-cv-06725 | 12/30/23 | Pla: Susan Kalra | Yes | Yes | Yes | n/a | |

| | | | | Def: Karon Nicole Fowler | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 40 | Mesa Digital, LLC v. Quanta Computer USA, INC. | 3:23-cv-06711 | 12/29/23 | Pla: Susan Kalra<br><br>Def: Jenny C Wu | Yes | Yes | No | n/a | 02/22/2024 |
| 41 | CyboEnergy, Inc. v. Northern Electric Power Technology, Inc. | 4:23-cv-06121 | 11/27/23 | Pla: Susan Kalra<br><br>Def: Xinlin Li Morrow | Yes | Yes | No | n/a | |
| 42 | Koji IP, LLC v. Energous Corporation | 4:23-cv-05750 | 11/8/2023 | Pla: Susan Kalra<br><br>Def: Michael J. Lyons | Yes | Yes | No | n/a | 02/21/2024 |
| 43 | HyperQuery, LLC v. LG Electronics U.S.A., Inc. | 3:23-cv-04725 | 9/14/2023 | Pla: Susan Kalra<br>Def: Michael Anthony Berta | Yes | Yes | No | 09/20/2023 From EDTX | 10/02/2023 |
| 44 | VDPP, LLC v. Vivo, Inc. | 5:23-cv-04241 | 8/18/23 | Pla: Susan Kalra | Yes | Yes | No | n/a | 01/23/2024 |
| 45 | Flick Intelligence, LLC v. Niantic, Inc. | 3:23-cv-02219 | 5/5/23 | Pla: Susan Kalra<br><br>Def: Lisa Kim Anh | Yes | Yes | No | n/a | 11/28/2023 |

| 46 | Street Spirit IP LLC v. Meta Platforms, Inc. et al | 3:23-cv-00879 | 2/27/23 | Pla: Susan Kalra<br><br>Def: Alan Michael Billharz | Yes | Yes | No | n/a | 07/31/2023 |
|----|----|----|----|----|----|----|----|----|----|
| 47 | Street Spirit IP LLC v. Instagram et al | 3:23-cv-00883 | 2/27/23 | Pla: Susan Kalra<br><br>Def: Alan Michael Billharz | Yes | Yes | No | n/a | 07/31/2023 |
| 48 | Street Spirit IP LLC v. LinkedIn Corporation | 3:23-cv-00884 | 2/27/23 | Pla: Susan Kalra<br><br>Def: Brock S Weber | Yes | Yes | No | n/a | 08/02/2023 |
| 49 | CyboEnergy, Inc. v. Northern Electric Power Technology, Inc. | 3:21-cv-08534 | 11/2/21 | Pla: Susan Kalra<br><br>Def: Xinlin Li Morrow | Yes | Yes | Yes | n/a | 12/27/2022 |
| 50 | PacSec3, LLC v. Juniper Networks, Inc. | 5:21-cv-07812 | 10/6/21 | Pla: William P. Ramey<br><br>Def: Megan Whyman Olesek | Yes | Yes | No | 10/06/2021 From EDTX | 11/29/2021 |
| 51 | Apple Inc. v. Traxcell Technologies LLC | 3:21-cv-06059 | 8/5/21 | Pla: B. Trent Webb<br><br>Def: Susan Kalra | Yes | Yes | Yes | n/a | 03/28/2022 |

| 52 | DATREC, LLC v. PrognoCIS, Inc. | 3:21-cv-01595 | 3/5/21 | Pla: Marc Henkin | Yes | Yes | Yes | n/a | 06/03/2021 |
|----|----|----|----|----|----|----|----|----|----|
| 53 | NetSoc, LLC v. Quora, Inc. | 3:19-cv-06518 | 10/11/19 | Pla: Susan Kalra<br><br>Def: Steven David Moore | Yes | Yes | Yes | 10/11/2019 From SDNY | 01/27/2020 |
| 54 | Global Equity Management (SA) Pty. Ltd. v. Alibaba.com, Inc. et al | 3:17-cv-02177 | 4/19/17 | Pla: John Thomas Def: Quinn, Emanuel, Urquhart & Sullivan LLP | Yes | Yes | Yes | 04/19/2017 From EDTX | 05/07/2020 |
| 55 | Global Equity Management (SA) Pty. Ltd. v. eBay, Inc. | 3:17-cv-02178 | 4/19/17 | Pla: John Thomas | Yes | Yes | Yes in 2177 | 04/20/2017 From EDTX | 05/05/2020 |
| 56 | Global Equity Management (SA) Pty. Ltd. v. Alibaba Group Holding, Ltd. et al | 3:17-cv-02435 | 4/19/17 | Pla: John Thomas | Yes | Yes | Yes in 2177 | 04/28/2017 From EDTX | 05/05/2020 |

# EXHIBIT C





### MR. WILLIAM PETERSON 'BILL' RAMEY

**Eligible to Practice in Texas**

#### RAMEY LLP

*Bar Card Number:* 24027643
*TX License Date:* 11/01/2000

*Primary Practice Location:* Houston , Texas

*5020 Montrose Blvd Ste 800*
*Houston, TX 77006-6578*

#### CONTACT INFORMATION

Tel: 713-426-3923 📞

---

*Practice Areas:* Antitrust, Business, Technology, Consumer, Ethics-Legal Malpractice, Insurance, Intellectual Property, Labor-Employment, Litigation: Commercial, Litigation: Personal Injury, Oil, Gas and Energy Resources, Real Estate, Entertainment, Construction, Appellate: Civil

---

*Statutory Profile Last Certified On:* 04/14/2021

#### PRACTICE INFORMATION

*Firm:* Ramey LLP

*Firm Size:* 2 to 5

*Occupation:* Private Law Practice

*Practice Areas: Antitrust, Business, Technology, Consumer, Ethics-Legal Malpractice, Insurance, Intellectual Property, Labor-Employment, Litigation: Commercial, Litigation: Personal Injury, Oil, Gas and Energy Resources, Real Estate, Entertainment, Construction, Appellate: Civil*

*Services Provided:*

Deaf/Hard of Hearing Translation: Not Specified
ADA-accessible client service: Not Specified
Language translation: Yes

#### COURTS OF ADMITTANCE

*Federal:*
Fifth Circuit Court of Appeals
Sixth Circuit Court of Appeals
US Court of Appeals for the Federal Circuit
Texas Eastern District Court
Texas Northern District Court
Texas Southern District/Bankruptcy Court
Texas Western District Court

*Other Courts:*
District Of Columbia - Patent Matters Federal - Other Court

*Other States Licensed:*
Utah

**Fee Options Provided:** ⊙

Contingency Fees: Yes

Flat Fees: Yes

Hourly Rate: Yes

Payment Plans: Yes

Sliding Scale Fees: Yes

**Please note:** Not all payment options are available for all cases, and any payment arrangement must be agreed upon by the attorney and his/her client. The State Bar of Texas is not responsible for payment arrangements between an attorney and his/her client.

**Please note:** This information is self-reported by Texas attorneys. Current license or admittance status can only be certified by the appropriate court or licensing entity.

**Foreign Language Assistance:**

Chinese, Spanish

## LAW SCHOOL

| School Degree earned | |
| --- | --- |
| South Texas College of Law | |
| **Graduation Date** | 05/2000 |

## PUBLIC DISCIPLINARY HISTORY

**State Bar of Texas**

No Public Disciplinary History

**Other States**

None Reported By Attorney

Sanctions that indicate a judgment is on appeal are still in effect but are not final and subject to change. To request a copy of a disciplinary judgment that is not available online or for more information about a specific disciplinary sanction listed above, please contact the Office of the chief Disciplinary Counsel at (877) 953-5535.

The Texas Attorney Profile provides basic information about Attorneys licensed to practice in Texas. Attorney profile information is provided as a public service by the State Bar of Texas as outlined in Section 81.115 of the Texas Government Code. The information contained herein is provided "as is" with no warranty of any kind, express or implied. Neither the State Bar of Texas, nor its Board of Directors, nor any employee thereof may be held responsible for the accuracy of the data. Much of the information has been provided by the attorney and is required to be reviewed and updated by the attorney annually. The information noted with an asterisk (*) is provided by the State Bar of Texas. Access to this site is authorized for public use only. Any unauthorized use of this system is subject to both civil and criminal penalties. This does not constitute a certified lawyer referral service.

# EXHIBIT D





### MR. JEFFREY 'JEFF' KUBIAK
**Eligible to Practice in Texas**

#### RAMEY LLP

*Bar Card Number:* 24028470
*TX License Date:* 11/01/2000

*Primary Practice Location:* Houston , Texas

*5020 Montrose Blvd Ste 800*
*Houston, TX 77006-6578*

---

*Practice Areas:* Intellectual Property

---

*Statutory Profile Last Certified On:* 02/02/2021

#### PRACTICE INFORMATION

*Firm:* Ramey LLP

*Firm Size:* 2 to 5

*Occupation:* Private Law Practice

*Practice Areas: Intellectual Property*

*Services Provided:*
Deaf/Hard of Hearing Translation: Not Specified
ADA-accessible client service: Not Specified
Language translation: Not Specified

*Fee Options Provided:* ❓
None Reported By Attorney

*Please note:* Not all payment options are available for all cases, and any payment arrangement must be agreed upon by the attorney and his/her client. The State Bar of Texas is not responsible for payment arrangements between an attorney and his/her client.

#### CONTACT INFORMATION

**Tel:** -- 📞

#### COURTS OF ADMITTANCE

*Federal:*
Texas Southern District/Bankruptcy Court
US Patent and Trademark Office

*Other Courts:*
None Reported By Attorney

*Other States Licensed:*
None Reported By Attorney

*Please note:* This information is self-reported by Texas attorneys. Current license or admittance status can only be certified by the appropriate court or licensing entity.

*Foreign Language Assistance:*

None Reported By Attorney

## LAW SCHOOL

| | |
|---|---|
| *School* | |
| *Degree earned* | |
| South Texas College of Law | |
| *Graduation Date* | 05/2000 |

## PUBLIC DISCIPLINARY HISTORY

### State Bar of Texas
No Public Disciplinary History

### Other States
None Reported By Attorney

Sanctions that indicate a judgment is on appeal are still in effect but are not final and subject to change. To request a copy of a disciplinary judgment that is not available online or for more information about a specific disciplinary sanction listed above, please contact the Office of the chief Disciplinary Counsel at (877) 953-5535.

The Texas Attorney Profile provides basic information about Attorneys licensed to practice in Texas. Attorney profile information is provided as a public service by the State Bar of Texas as outlined in Section 81.115 of the Texas Government Code. The information contained herein is provided "as is" with no warranty of any kind, express or implied. Neither the State Bar of Texas, nor its Board of Directors, nor any employee thereof may be held responsible for the accuracy of the data. Much of the information has been provided by the attorney and is required to be reviewed and updated by the attorney annually. The information noted with an asterisk (*) is provided by the State Bar of Texas. Access to this site is authorized for public use only. Any unauthorized use of this system is subject to both civil and criminal penalties. This does not constitute a certified lawyer referral service.

# EXHIBIT E

| | |
|---|---|
| **From:** | Gene Quinn |
| **To:** | William Ramey |
| **Cc:** | Eileen McDermott; Renee Quinn |
| **Subject:** | IPWatchdog |
| **Date:** | Friday, April 4, 2025 9:14:48 AM |

Hi Bill.

I write today to inform you of my decision to remove your articles and profile from IPWatchdog.com. With you being sanctioned multiple times in multiple courts we cannot allow the taint of your reputation to be transferred to IPWatchdog.

-Gene

Eugene R. Quinn, Jr.
President & CEO, IPWatchdog.com

DISCLAIMER: IPWatchdog, Inc. is not a law firm. The information on the pages of IPWatchdog are intended to be informational, does not create an attorney-client relationship and does not constitute legal advice. An attorney-client relationship can only be created through execution of a written agreement and payment of a retainer.

# EXHIBIT F

---

**Patent Claims Analysis**

**of**

**US10790703: "Smart wireless power transfer between devices"**

**against**

**Renesas Electronics's PTX130W/PTX30W**

---

# US10790703B2

United States

Inventor          Koji Yoden

---

Worldwide applications

2017  US

---

| 15/843,092 | Claims priority from a provisional application | 62/435,883 | 12/19/2016 |
|---|---|---|---|

---

Total patentTerm Adjustments

**0**

CLAIMS

1. A wireless power transfer system for wirelessly charging a powered device, comprising:

a battery power source for supplying power to the wireless power transfer system;

wireless communication circuitry for establishment of a close-range wireless communication over which a message associated with the powered device is communicated from the powered device; and

wireless powering circuitry including a transmitter configured to emit electromagnetic waves to form a radiative powering region within which the electromagnetic waves can be received by wireless powered circuitry of the powered device to generate power for charging a battery in the powered device, the wireless powering circuitry being configured to be activated when the close-range wireless communication is established,

wherein transmission power of the wireless communication circuitry is so controlled as to make a range of the close-range wireless communication substantially narrower than a range of the radiative powering region,

wherein the message is issued by the powered device when a battery level of the battery is below a predetermined threshold, and the wireless powering circuitry is configured to be activated in response to receipt of the message from the powered device over the established close-range wireless communication, and

wherein, when the wireless power transfer system is powered by the battery power source, a determination is made whether a level of drop in a battery level of the battery power source in a given time period is below a threshold, so that activation of the wireless powering circuitry is allowed only when the level of drop is determined to be below the threshold.

| US10790703<br>Claim 1 | Renesas Electronics's PTX130W/PTX30W |
|---|---|
| 1. A wireless power transfer system for wirelessly charging a powered device, comprising: | <br><br>PTX130W/PTX30W Hardware Integration<br><br>© 2023 Renesas Electronics<br><br><https://www.renesas.com/us/en/document/mah/ptx130w-ptx30w-hardware-integration-manual?r=25426216><br>R35UH0013EE0100 Rev.1.00<br>Nov 22, 2023<br><br>*Renesas Electronics's PTX130W/PTX30W (MUST BE BOUGHT TOGETHER IN ORDER TO ACHIEVE POWER TRANSFER) is a wireless power transfer system for wirelessly charging a powered device.* |

| US10790703<br>Claim 1 | Renesas Electronics's PTX130W/PTX30W |
|---|---|
| a **battery power source** for supplying power to the wireless power transfer system; | <table><tr><th colspan="2">Product features</th><th></th></tr><tr><td>Ultra-low power on-chip embedded core</td><td></td><td>✓</td></tr><tr><td>Integrated PMIC solution</td><td></td><td>✓</td></tr><tr><td>Integrated flexible battery charger with reverse current limiter</td><td></td><td>✓</td></tr><tr><td>Integrated highly efficient active rectifier</td><td></td><td>✓</td></tr><tr><td>Standalone mode of operation (without Host MCU)</td><td></td><td>✓</td></tr><tr><td>Embedded power regulation control</td><td></td><td>✓</td></tr><tr><td>Required PCB integration area (est.)</td><td></td><td>17 mm²</td></tr><tr><td>Rectification efficiency (AC to DC)</td><td></td><td>up to 92%</td></tr><tr><td>Energy harvesting [W]</td><td></td><td>up to 1W</td></tr><tr><td>Charging current range [mA]</td><td></td><td>5-250 mA</td></tr><tr><td>Li-Ion and Li-Polymer batteries support</td><td></td><td>✓</td></tr><tr><td>Charge status monitor</td><td></td><td>✓</td></tr><tr><td>On-chip over-temperature detection/protection</td><td></td><td>✓</td></tr><tr><td>Transparent data exchange channel</td><td></td><td>✓</td></tr><tr><td>Shipping mode (support for battery protection)</td><td></td><td>✓</td></tr><tr><td>System MCU supply output voltage, typ. [V]</td><td></td><td>1.8, 3.3 V</td></tr><tr><td>Battery-less power supply output</td><td></td><td>✓</td></tr><tr><td>JEITA support</td><td></td><td>✓</td></tr><tr><td>Shipping mode current consumption, typ. [nA]</td><td></td><td>25 nA</td></tr><tr><td>I2C clock frequency [kHz]</td><td></td><td>Up to 1 MHz</td></tr><tr><td>Available packages</td><td></td><td>CSP16</td></tr><tr><td>Temperature range [°C]</td><td></td><td>-40 to +85</td></tr></table><br><https://www.renesas.com/us/en/document/ovr/nfc-wireless-charging-wlc-product-overview?r=25426216> 2022-12-15<br><br>*For example, Renesas Electronics's PTX130W/PTX30W describes "Li-Ion and Li-Polymer batteries support", which means the existence of a battery power source.* |

| | |
|---|---|
| a battery power source for supplying power to the **wireless power transfer system**; | ## NFC wireless charging system consists of:<br><br>• WLC Poller (power transmitter and communication initiator)<br>• WLC Listener (power receiver)<br><br>NFC wireless charging solution is based on well-established NFC technology operating at 13.56MHz.<br><br><br><br><https://www.renesas.com/us/en/document/ovr/nfc-wireless-charging-wlc-product-overview?r=25426216> 2022-12-15<br><br>*For example, Renesas Electronics's PTX130W/PTX30W describes "Li-Ion and Li-Polymer batteries support", which means supplying power to the wireless power transfer system.* |

| US10790703<br>Claim 1 | Renesas Electronics's PTX130W/PTX30W |
|---|---|
| **wireless communication circuitry** for establishment of a close-range wireless communication over which a **message** associated with the powered device is communicated from the powered device; and | NFC wireless charging system consists of:<br><br>• WLC Poller (power transmitter and communication initiator)<br>• WLC Listener (power receiver)<br><br>NFC wireless charging solution is based on well-established NFC technology operating at 13.56MHz.<br><br><br><https://www.renesas.com/us/en/document/prb/ptx30w-nfc-wireless-charging-listener-ic-product-brief?r=25426216> 2022-12-15<br><br>*For example, Renesas Electronics's PTX130W/PTX30W depicts and describes wireless communication circuitry for establishment of a close-range wireless communication (NFC wireless) over which a message associated with the powered device is communicated from the powered device.  If there is communication, there should be exchange of messages.  NFC is close-range wireless communication technology.* |

| US10790703<br>Claim 1 | Renesas Electronics's PTX130W/PTX30W |
|---|---|
| **wireless powering circuitry** including a **transmitter** configured to emit electromagnetic waves to form a radiative powering region within which the electromagnetic waves can be received by wireless powered circuitry of the powered device to generate power for charging a battery in the powered device, the wireless powering circuitry being configured to be **activated when the close-range wireless communication is established**, | ## NFC wireless charging system consists of:<br><br>• WLC Poller (power transmitter and communication initiator)<br>• WLC Listener (power receiver)<br><br>## NFC wireless charging solution is based on well-established NFC technology operating at 13.56MHz.<br><br><br><https://www.renesas.com/us/en/document/prb/ptx30w-nfc-wireless-charging-listener-ic-product-brief?r=25426216> 2022-12-15<br><br>*For example, Renesas Electronics's PTX130W/PTX30W describes WLC Poller (power transmitter and communication initiator) and WLC Listener (power receiver) which form wireless powering circuitry being configured to be activated when the close-range wireless communication is established.  Transmitter and Receiver use electromagnetic waves to communicate.  Charging is activated only when close-range communication is activated.* |

| US10790703<br>Claim 1 | Renesas Electronics's PTX130W/PTX30W |
|---|---|
| wherein transmission power of the wireless communication circuitry is so controlled as to **make a range of the close-range wireless communication substantially narrower** than a range of the radiative powering region, | <br>\<https://www.renesas.com/us/en/document/mah/ptx130w-ptx30w-hardware-integration-manual?r=25426216\> 2022-12-15<br><br>*For example, Renesas Electronics's PTX130W/PTX30W depicts a close-range wireless communication (ABOVE, SMALL YELLOW) and a radiative powering region (BELOW, LARGE BLUE WITH CONCENTRIC CIRCLES), in which the close-range wireless communication is substantially narrower than the radiative powering region.* |

| US10790703<br>Claim 1 | Renesas Electronics's PTX130W/PTX30W |
|---|---|
| wherein the **message is issued by the powered device when a battery level of the battery is below a predetermined threshold**, and the wireless powering circuitry is configured to be activated in response to receipt of the message from the powered device over the established close-range wireless communication, and | Using the VDDC node to supply the system requires power management on that node. The voltage present on the load is either directly the battery voltage when there is no RF field present, or a voltage roughly 300mV higher than the battery voltage, up to a maximum of 5.2V while it is charging. The limits on the VDDC current capability when driving the system are given in the datasheet.<br><br><br><br><https://www.renesas.com/us/en/document/mah/ptx130w-ptx30w-hardware-integration-manual?r=25426216> 2022-12-15<br><br>*For example, Renesas Electronics's PTX130W/PTX30W has power management which conducts "The voltage present on the load is either directly the battery voltage when there is no RF field present, or a voltage roughly 300mV higher than the battery voltage, up to a maximum of 5.2V while it is charging. The limits on the VDDC current capability when driving the system are given in the datasheet."* |

| US10790703 Claim 1 | Renesas Electronics's PTX130W/PTX30W |
|---|---|
| wherein, when the wireless power transfer system is powered by the battery power source, a **determination is made whether a** level of drop in a battery level **of the battery power source in a given time period is below a threshold**, so that activation of the wireless powering circuitry is allowed only when the level of drop is determined to be below the threshold. | Using the VDDC node to supply the system requires power management on that node. The voltage present on the load is either directly the battery voltage when there is no RF field present, or a voltage roughly 300mV higher than the battery voltage, up to a maximum of 5.2V while it is charging. The limits on the VDDC current capability when driving the system are given in the datasheet.  <https://www.renesas.com/us/en/document/mah/ptx130w-ptx30w-hardware-integration-manual?r=25426216> 2022-12-15 *For example, Renesas Electronics's PTX130W/PTX30W has power management which conducts "The voltage present on the load is either directly the battery voltage when there is no RF field present, or a voltage roughly 300mV higher than the battery voltage, up to a maximum of 5.2V while it is charging. The limits on the VDDC current capability when driving the system are given in the datasheet."* |

# EXHIBIT G

| US10790703 B2 Claim 1 | Renesas Electronics's EVK Evaluation Kit |
|---|---|
| 1. A wireless power transfer system for wirelessly charging a powered device, comprising: | **RENESAS**  **P9222-R-EVK Evaluation Kit Manual**<br><br>**Description**<br>The P9222-R-EVK Wireless Power Evaluation Board can be used to demonstrate the features and performance of the P9222-R 5W Wireless Power Receiver in low power 2.5W applications such as in earbuds charging cases. The P9222-R-EVK can also supply up to 5W power. IDT's P9235A-RB-EVK Evaluation Board or any other Qi certified transmitter can be used as the power transmitter for P9222-R evaluation board testing.<br><br>The P9222-R-EVK demonstrates a high-efficiency, turnkey reference design and is supported by comprehensive online, digital resources to significantly expedite the design-in effort and enable rapid prototyping. The printed circuit board (PCB) has four layers. The total solution area (excluding coil) is approximately 70 mm² out of which 37 mm² is occupied by the components. A small 30×30mm power receiver coil is used in the design to meet small form-factor device requirements.<br><br>Using the P9222-R Windows GUI and the P9222-R-EVK, customers can quickly customize operating parameters for their applications. Operating parameters such as foreign object detection (FOD) parameters can be configured by either writing to internal SRAM registers via the I2C interface, or by loading the user configuration generated by the P9222-R Windows GUI into an external EEPROM. The P9222-R-EVK has an on-board external EEPROM and connectors to plug-in the USB to an I2C programming dongle.<br><br>**Features**<br>• WPC1.2.4 Baseline Power Profile (5W) compatible<br>• Design optimized for low power (2.5W) applications with 30×30mm coil<br>• Approximately 70mm² solution area<br>• Schematic and layout files are available online<br>• Works with the P9222-R Windows GUI<br>• Easy configuration of design parameters through I2C interface<br>• On-board external EEPROM for flexible design parameter updates<br>• J12 connector compatible with the "USB-FTDI-V2-1" (FTDI) and ARM60 USB-to-I2C dongles<br>• 4-layer PCB with 1oz copper<br><br>**Kit Contents**<br>• P9222-R-EVK Evaluation board including the coil assembly<br><br>© 2020 Renesas Electronics Corporation. All rights reserved.<br><https://www.renesas.com/us/en/document/mah/p9222-r-evaluation-kit-manual?r=32315><br><br>Renesas Electronics's EVK Evaluation Kit is a wireless power transfer system for wirelessly charging a powered device.<br><br>The reference includes subject matter disclosed by the claims of the patent after the priority date. |

| US10790703 B2 Claim 1 | Renesas Electronics's EVK Evaluation Kit |
|---|---|
| a **battery power source** for supplying power to the wireless power transfer system; | **3.1   LDO Output Voltage (VOUT) Configuration**<br><br>The default VOUT voltage of the P9222-R-EVK is 5.0V. The user can change the default Vout voltage in accordance with specific user design requirements and store the modified configuration in the external EEPROM, or an external Applications Processor (AP) can adjust VOUT voltage continuously via the I2C interface. In addition, an external MCU can continuously read the battery voltage and change VOUT to lower the losses in the battery charger to optimize the total system efficiency. The P9222-R configurable Vout voltage range is from 3.5V to 12V.<br><br><https://www.renesas.com/us/en/document/mah/p9222-r-evaluation-kit-manual?r=32315><br><br>The reference describes a battery power source for supplying power to the wireless power transfer system. |

| US10790703 B2 Claim 1 | Renesas Electronics's EVK Evaluation Kit |
|---|---|
| wireless **communication circuitry** for establishment of a close-range wireless communication over which a **message** associated with the powered device is communicated from the powered device; and | **3.4.1   Modulation Capacitor and Interrupt Enables**<br><br>The P9222-R sends the communication packets to the transmitter using ASK modulation of the coil voltage. For ASK modulation, the P9222-R switches the capacitors on and off that are on the COM1, COM2, CMA, and CMB pins using internal MOSFETs. By default, the P9222-R switches only the MOSFETs on the COM1 and COM2 pins. ASK modulation depth can be increased by enabling the switches on the CMA and CMB pins. Measure the modulation depth on the transmitter demodulation circuitry, and if too small, adjust the ASK modulation depth by enabling the CMA and CMB switches. Modulation depth can also be increased by increasing the capacitor value. The AP can also change the ASK modulation depth by writing to the ASK modulation depth Registers (0xF4).<br><br><https://www.renesas.com/us/en/document/mah/p9222-r-evaluation-kit-manual?r=32315><br><br>The reference describes wireless communication circuitry for establishment of a close-range wireless communication over which a message associated with the powered device is communicated from the powered device. |

| US10790703 B2 Claim 1 | Renesas Electronics's EVK Evaluation Kit |
|---|---|
| **wireless powering circuitry** including a **transmitter** configured to emit electromagnetic waves to form a radiative powering region within which the electromagnetic waves can be received by wireless powered circuitry of the powered device to generate power for charging a battery in the powered device, the wireless powering circuitry being configured to be **activated when the close-range wireless communication is established**, | **3.4.1 Modulation Capacitor and Interrupt Enables**<br><br>The P9222-R sends the communication packets to the transmitter using ASK modulation of the coil voltage. For ASK modulation, the P9222-R switches the capacitors on and off that are on the COM1, COM2, CMA, and CMB pins using internal MOSFETs. By default, the P9222-R switches only the MOSFETs on the COM1 and COM2 pins. ASK modulation depth can be increased by enabling the switches on the CMA and CMB pins. Measure the modulation depth on the transmitter demodulation circuitry, and if too small, adjust the ASK modulation depth by enabling the CMA and CMB switches. Modulation depth can also be increased by increasing the capacitor value. The AP can also change the ASK modulation depth by writing to the ASK modulation depth Registers (0xF4).<br><br><https://www.renesas.com/us/en/document/mah/p9222-r-evaluation-kit-manual?r=32315><br><br>The reference describes wireless powering circuitry including a transmitter configured to emit electromagnetic waves to form a radiative powering region within which the electromagnetic waves can be received by wireless powered circuitry of the powered device to generate power for charging a battery in the powered device, the wireless powering circuitry being configured to be activated when the close-range wireless communication is established. |

| US10790703 B2 Claim 1 | Renesas Electronics's EVK Evaluation Kit |
|---|---|
| wherein transmission power of the wireless communication circuitry is so controlled as to **make a range of the close-range wireless communication substantially narrower** than a range of the radiative powering region, | <br><br>Green LED on P9222-R-EVK indicates the wireless connection has been made<br><br>Green LED on P9235A-RB-EVK indicates the wireless connection has been made<br><br><https://www.renesas.com/us/en/document/mah/p9222-r-evaluation-kit-manual?r=32315><br><br>The reference describes transmission power of the wireless communication circuitry is so controlled as to make a range of the close-range wireless communication substantially narrower than a range of the radiative powering region. |

| US10790703 B2 Claim 1 | Renesas Electronics's EVK Evaluation Kit |
|---|---|
| wherein the **message is issued by the powered device when a battery level of the battery is below a predetermined threshold**, and the wireless powering circuitry is configured to be activated in response to receipt of the message from the powered device over the established close-range wireless communication, and<br><br>wherein, when the wireless power transfer system is powered by the battery power source, a **determination is made whether a** level of drop in a battery level **of the battery power source in a given time period is below a threshold**, so that activation of the wireless powering circuitry is allowed only when the level of drop is determined to be below the threshold. | **3.2    Current Limit (ILIM) Configuration**<br><br>The current limit threshold value is used to limit the output current of main LDO on the VOUT pin. If the output current reaches the target limit value, the VOUT voltage level will decrease due to the current limit setting if the output load is over the current limit level. The default ILIM value of the P9222-EVK is 1.6A. The user can change the default current limit value in accordance with specific user design requirements and store the modified configuration into an external EEPROM. In addition, after the P9222-R enters the power transfer phase, an external AP can adjust the ILIM value by writing to the ILIM_Set register (0x3D) via the I2C interface. The P9222-R firmware reads the internal register value in regular time base and updates the current limit value. The current limit can be incremented in steps of 100mA.<br><br>$$Current\ Limit\ (ILIM) = Decimal\ Value\ of\ 0x3D\ register\ *\ 0.1\ (A) \qquad \textbf{Equation 2}$$<br><br>The default Current Limit value can be configured by writing a configuration file into the external EEPROM. The configuration file can be generated using the P9222-R Windows GUI. For information on how the configuration file can be generated using the P9222-R Windows GUI, see "VOUT Configuration Change Using an External EEPROM."<br><br><https://www.renesas.com/us/en/document/mah/p9222-r-evaluation-kit-manual?r=32315><br><br>The reference describes the message is issued by the powered device when a battery level of the battery is below a predetermined threshold, and the wireless powering circuitry is configured to be activated in response to receipt of the message from the powered device over the established close-range wireless communication.<br><br>The reference describes when the wireless power transfer system is powered by the battery power source, a determination is made whether a level of drop in a battery level of the battery power source in a given time period is below a threshold, so that activation of the wireless powering circuitry is allowed only when the level of drop is determined to be below the threshold. |

# EXHIBIT H

Susan S.Q. Kalra (CA State Bar No. 16740)
Email: skalra@rameyfirm.com
RAMEY LLP
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
Telephone: (800) 993-7499
Fax: (832) 900-4941

William P. Ramey, III (*pro hac vice* anticipated)
Email: wramey@rameyfirm.com
RAMEY LLP
5020 Montrose Blvd., Suite 800
Houston, TX 77006
Telephone: (713) 426-3923
Fax: (832) 689-9175

*Attorneys for Plaintiff*
Koji IP, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KOJI IP, LLC, a Texas Corporation,<br><br>                              Plaintiff,<br><br>    v.<br><br>RENESAS ELECTRONICS AMERICA, INC., a California Corporation,<br><br>                              Defendant. | Case No.: 3:23-cv-05752<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**(35 U.S.C. § 271)**<br><br>**JURY TRIAL DEMANDED** |

Koji IP, LLC ("Plaintiff" or "Koji") files this First Amended Complaint and demand for jury trial seeking relief from patent infringement of the claims of U.S. Patent No. 10,790,703 ("the '703 patent") (referred to as the "Patent-in-Suit") by Renesas Electronics America Inc. ("Defendant" or "Renesas"). This First Amended complaint is filed by Agreement of the Parties and before the defendant has answered or otherwise pleaded.

**I.      THE PARTIES**

1.   Plaintiff is a Texas Limited Liability Company with its principal place of business located in Travis County, Texas.

2.   On information and belief, Defendant is a corporation organized and existing under the laws of the State of California, with a regular and established place of business located at 6024 Silver Creek Valley Road, San Jose, California 95138.

3.   On information and belief, Defendant sells and offers to sell products and services throughout California, including in this judicial district, and introduces products and services that perform infringing methods or processes into the stream of commerce knowing that they would be sold in California and this judicial district. Defendant has been served.

## II.   JURISDICTION AND VENUE

4.   This Court has original subject-matter jurisdiction over the entire action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Plaintiff's claim arises under an Act of Congress relating to patents, namely, 35 U.S.C. § 271.

5.   This Court has personal jurisdiction over Defendant because: (i) Defendant is present within or has minimum contacts within the State of California and this judicial district; (ii) Defendant has purposefully availed itself of the privileges of conducting business in the State of California and in this judicial district; and (iii) Plaintiff's cause of action arises directly from Defendant's business contacts and other activities in the State of California and in this judicial district.

6.   Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1400(b).  Defendant has committed acts of infringement and has a regular and established place of business in this District. Further, venue is proper because Defendant conducts substantial business in this forum, directly or through intermediaries, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct and/or

1  deriving substantial revenue from goods and services provided to individuals in California and this

2  District.

3  **III.    INFRINGEMENT - Infringement of the '703 Patent**

4  7.   On September 29, 2020, U.S. Patent No. 10,790,703 ("the '703 patent", included as Exhibit

5  A and part of this complaint) entitled "Smart wireless power transfer between devices" was duly

6  and legally issued by the U.S. Patent and Trademark Office. Plaintiff owns the '703 patent by

7  assignment.

8  8.   The '703 patent relates to novel and improved methods and systems for wireless power

9

10 charging.

11 9.   Defendant maintains, operates, and administers systems, products, and services that

12 infringes one or more of claims 1-4 of the '703 patent, literally or under the doctrine of equivalents.

13 Defendant put the inventions claimed by the '703 Patent into service (i.e., used them); but for

14 Defendant's actions, the claimed-inventions embodiments involving Defendant's products and

15 services would never have been put into service.  Defendant's acts complained of herein caused

16 those claimed-invention embodiments as a whole to perform, and Defendant's procurement of

17 monetary and commercial benefit from it.

18

19 10. Support for the allegations of infringement may be found in the chart attached as Exhibit B.

20 These allegations of infringement are preliminary and are therefore subject to change.

21

22 11. Defendant has and continues to induce infringement. Defendant has actively encouraged or

23 instructed others (e.g., its customers and/or the customers of its related companies), and continues

24 to do so, on how to use its products and services (e.g., for wireless power charging) such as to cause

25 infringement of one or more of claims 1-4 of the '703 patent, literally or under the doctrine of

26 equivalents.  Moreover, Defendant has known of the '703 patent and the technology underlying it

27

28

from at least the filing date of the lawsuit.[1] For clarity, direct infringement is previously alleged in this complaint. Further, Renesas specifically intended that a third party infringe the patent and knew that the third party's acts constituted infringement.

12. Defendant has and continues to contributorily infringe. Defendant has actively encouraged or instructed others (e.g., its customers and/or the customers of its related companies), and continues to do so, on how to use its products and services (e.g., for wireless power charging) and related services such as to cause infringement of one or more of claims 1-4 of the '703 patent, literally or under the doctrine of equivalents. Further, there are no substantial non-infringing uses for Defendant's products and services. Moreover, Defendant has known of the '703 patent and the technology underlying it from at least the filing date of the lawsuit.[2] For clarity, direct infringement is previously alleged in this complaint. Further, Renesas specifically intended that a third party infringe the patent and knew that the third party's acts constituted infringement.

13. Defendant has caused and will continue to cause Plaintiff damage by direct and indirect infringement of (including inducing infringement of) the claims of the '703 patent.

## IV. JURY DEMAND

Plaintiff hereby requests a trial by jury on issues so triable by right.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a. enter judgment that Defendant has infringed the claims of the '703 patent;

b. award Plaintiff damages in an amount sufficient to compensate it for Defendant's infringement of the Patents-in-Suit in an amount no less than a reasonable royalty or lost

---

[1] Plaintiff reserves the right to amend and add inducement pre-suit if discovery reveals an earlier date of knowledge.
[2] Plaintiff reserves the right to amend and add inducement pre-suit if discovery reveals an earlier date of knowledge.

First Amended Complaint – Case No. 5:23-cv-5752

profits, together with pre-judgment and post-judgment interest and costs under 35 U.S.C. § 284;

c.  award Plaintiff an accounting for acts of infringement not presented at trial and an award by the Court of additional damage for any such acts of infringement;

d.  declare this case to be "exceptional" under 35 U.S.C. § 285 and award Plaintiff its attorneys' fees, expenses, and costs incurred in this action;

e.  declare Defendant's infringement to be willful and treble the damages, including attorneys' fees, expenses, and costs incurred in this action and an increase in the damage award pursuant to 35 U.S.C. § 284;

f.  a decree addressing future infringement that either (if) awards a permanent injunction enjoining Defendant and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with Defendant from infringing the claims of the Patents-in-Suit, or (ii) awards damages for future infringement in lieu of an injunction in an amount consistent with the fact that for future infringement the Defendant will be an adjudicated infringer of a valid patent, and trebles that amount in view of the fact that the future infringement will be willful as a matter of law; and

g.  award Plaintiff such other and further relief as this Court deems just and proper.

Dated: January 12, 2024                Respectfully submitted,

                                       RAMEY LLP

                                       /s/ Susan S.Q. Kalra
                                       Susan S.Q. Kalra (CA State Bar No. 16740)
                                       skalra@rameyfirm.com
                                       5020 Montrose Blvd., Suite 800
                                       Houston, Texas 77006
                                       (800) 993-7499
                                       (832) 900-4941 (facsimile)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Plaintiff*
*Koji IP LLC*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a trial by jury on issues so triable by right.

Dated: January 12, 2024     Respectfully submitted,

          **RAMEY LLP**

          */s/ Susan S.Q. Kalra*
          Susan S.Q. Kalra (CA State Bar No. 16740)
          skalra@rameyfirm.com
          5020 Montrose Blvd., Suite 800
          Houston, Texas 77006
          (800) 993-7499
          (832) 900-4941 (facsimile)

          *Northern California Office:*
          303 Twin Dolphin Drive, Suite 600
          Redwood City, CA, US 94065

          */s/ William P. Ramey, III*
          William P. Ramey, III (*pro hac vice* anticipated)
          Texas Bar No. 24027643
          wramey@rameyfirm.com

          Jeffrey E. Kubiak (*pro hac vice* anticipated)
          Texas Bar No. 24028470
          jkubiak@rameyfirm.com

          5020 Montrose Blvd., Suite 800
          Houston, Texas 77006
          Telephone: (713) 426-3923
          Fax: (832) 689-9175

          ***Attorneys for Plaintiff***
          ***KOJI IP, LLC***

# EXHIBIT I

# maschoff
# brennan

415.738.6228
450 Sansome Street, Suite 1005
San Francisco, California 94111

Jason A. Crotty
jcrotty@mabr.com
415.969.6918

January 18, 2024

William P. Ramey, III (wramey@rameyfirm.com)
Susan S.Q. Kalra (skalra@rameyfirm.com)
Ramey LLP
5020 Montrose Blvd., Suite 800
Houston, TX 77006

Re:    *Koji IP, LLC v. Renesas Electronics America, Inc.*
       Case No. 3:23-cv-05752-LJC (N.D. Cal.)

Dear Bill:

Koji IP has suggested that it will serve infringement contentions against additional Renesas products (RX111, ISL1801 and PTX30W).  To date, Koji IP has failed to provide any claim charts or analysis to substantiate this supposed infringement.

Nevertheless, even a cursory analysis indicates that any such claims would be frivolous, again raising substantial concerns that this case was filed for an improper purpose:  to leverage the substantial cost of litigation to obtain a modest settlement notwithstanding the absence of a meritorious claim.

None of the RX111, ISL1801 and PTX30W products include any of the wireless charging requirements of the claims (*e.g.*, "battery power source" and "transmitter," among others).  Thus, there does not appear to be any plausible direct infringement case against these products.  Nor is there any evidence of indirect infringement.  Moreover, the RX111 and ISL1801 products were both on the market *before* the Koji IP provisional application was filed in December 2016.  Attached are data sheets for the RX111 (May 2016) and the ISL1801 (July 2014) products.  Even if there were somehow a viable direct infringement claim against them, the datasheets would be invalidating prior art.

These additional "accused" products appear to have been selected not because they plausibly include the limitations of the claims, but rather because they can be leveraged to expand the potential exposure to Renesas to encourage some sort of settlement.  Because there are no credible infringement arguments against any of these products, however, there cannot be any non-frivolous claims directed towards them.

As we have previously stated, this action should not have been filed and should be promptly dismissed.  Koji IP was plainly aware of the manifest failings of this case — previously set forth by Renesas in the motion to dismiss in the Colorado action — before this action was filed, raising issues under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927.  This case cannot be salvaged by casually asserting infringement by products that cannot infringe, especially products that would be prior art to the patent-in-suit.

**maschoff**
**brennan**

We note that Koji IP has not provided a written response to the numerous issues we raised in our prior letter, further indicating the lack of substantive merit.  If Koji IP has a substantive response to the issues raised in this and our prior letter, please put that response in writing, with citation to relevant law and facts, and we will consider it.

Otherwise, please be again advised that if this matter moves forward, Renesas will seek to have this case declared "exceptional" under § 285 and it will seek its fees. *See generally EscapeX IP LLC v. Google LLC*, 2023 WL 5257691 (N.D. Cal. 2023).  However, the best resolution of this case continues to be voluntary dismissal by Koji IP.

If you have any questions, please let me know.

Sincerely,

Jason A. Crotty